**In re NUKO INFORMATION SYSTEMS, INC. SECURITIES LITIGATION.**

**This document relates to: All Actions.**

**No. C 97 20471 EAI.**

United States District Court,
N.D. California,
San Jose Division.

June 19, 2000.

Robert S. Green, Anthony K. Lee, Girard & Green, LLP, San Francisco, CA, Jonathan M. Plasse, Robert Giallombardo, Goodkind Labaton Rudoff & Sucharow LLP, New York, NY, Herbert E. Milstein, Daniel S. Sommers, Cohen Milstein Hausfeld & Toll, P.L.L.C., Washington, DC, for Plaintiffs.

Marc W. Rappel, James J. Farrell, Latham & Watkins, Los Angeles, CA, for Defendants.

## OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

INFANTE, United States Magistrate Judge.

Currently before the court is Defendants' Motion to Dismiss the Second Amended Complaint ("SAC") under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. The underlying action is a securities fraud class action brought under the Securities Exchange Act of 1934. Defendants move to dismiss the SAC for Plaintiffs' failure to satisfy the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), as interpreted by the Ninth Circuit in *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970 (9th Cir.), *reh'g denied*, 195 F.3d 521 (9th Cir.1999).

## I. BACKGROUND

### A. Facts [1]

Nuko Information Systems, Inc. ("Nuko") is a Delaware corporation with executive of-

---

**1.** The facts set forth in this opinion are as alleged by Plaintiffs in the SAC, and at this stage in the proceedings are accepted as true. *See NL Industries, Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.1986).

fices in San Jose.[2] Nuko designs, markets, and sells video networking products. At all relevant times, Defendant John H. Gorman was its Vice President of Finance, Chief Financial Officer, Secretary, and Treasurer. Defendant Pratap K. Kondamoori was its President, Chief Executive Officer, and Chairman of the Board. Gorman and Kondamoori each owned a significant number of shares of Nuko stocks.

On February 14, 1997, Nuko announced that it had incurred a loss of $6.7 million for the fourth fiscal quarter of 1996 ("4Q96"). Due to this announcement, Nuko's stocks fell about 20% that day. During a conference call with analysts and investors that same day, Gorman and Kondamoori indicated that Nuko's poor performance was due to increased expenses in sales and marketing. Defendants also represented that Nuko did not recognize revenue from potential customers who had received products on a trial basis. According to the Plaintiffs, Gorman and Kondamoori's statements reflected Nuko's past practice of recognizing revenues. After the February 14, 1997 announcement, the market took a 'wait and see' approach to determine whether reported revenues would improve. According to Plaintiffs, however, revenues did not improve. Rather, customers were returning products at record levels and sales decreased dramatically.

Nuko originally planned to release its first fiscal quarter 1997 ("1Q97") results on April 25, 1997. On April 17, 1997, however, Nuko announced that it would release its 1Q97 results one day early on April 24, 1997. According to Plaintiffs, this tactic was designed to increase the effect on the average price of Nuko stock. Early release, Plaintiffs allege, signaled that the results would be positive. In response to the April 17 announcement, Nuko's stock rose 13% within one day, and rose 20% within the week.

On April 21, 1997, Nuko entered into an agreement with Internext Compression, Inc. to acquire 1,600,000 shares of Internext stock in exchange for $1 million in Nuko stock. The Internext Agreement gave Nuko access to technology enabling Nuko to expand its product offerings. In accordance with the agreement, the two companies exchanged their stocks on May 6, 1997.

The Internext Agreement provided an incentive for Nuko to inflate the price of its stock—increasing its price per share would decrease the number of shares Nuko would be required to issue to Internext. In addition, the Internext Agreement provided for a "Post Closing Adjustment" requiring a pricing adjustment based on future fluctuations of Nuko's stock. Specifically, within 90 days of closing the Internext Agreement, Nuko was required to file a registration statement with the SEC registering its shares issued to Internext. On the day before filing the registration statement, the value of Nuko's shares was to be calculated by multiplying the number of shares being transferred to Internext by the average closing price over the ten trading days preceding the calculation date. If the value of the Nuko shares registered exceeded $1 million, Internext would refund the difference to Nuko in cash. On the other hand, if Nuko's stocks declined, Nuko would be required to make up the difference to Internext. This aspect of the agreement provided Defendants with a motive to inflate the price of Nuko stock even after the pricing period.

On April 24, 1997, Nuko issued a press release announcing its financial results for 1Q97, results that were significantly better than the preceding quarter, 4Q96. Nuko reported its revenue for 1Q97 as $6.1 million, as compared to $4.146 million for 4Q96, and its loss for 1Q97 as $1.8 million, as compared to $6.7 million for 4Q96. The 1Q97 reported results were also remarkably better than those reported for the same period of the preceding year (1Q96). Nuko's reported revenues for 1Q97 reflected a $5.5 million increase over 1Q96, and a decrease in net loss of about $1.25 million as compared to 1Q96. In announcing its 1Q97 results, Kondamoori stated that Nuko was pleased with the results, that new customers had been added, that new products solutions had been introduced, and that Nuko was positioned to play a major role in the deployment of advanced broadband networks. Gorman's name was

2. Nuko has filed for bankruptcy protection and is    not implicated in this motion.

listed on the press release as the contact person. The market responded positively to the announcement, and Nuko's stocks continued to rise.

Shortly after its April 24 announcement, Nuko's accountants reviewed its 1Q97 financial report and discovered that approximately $4 million of the $6.1 million revenues reported had been improperly recognized. In its May 14, 1997 SEC filing, and at the accountants' urging, Nuko stated that reversal of a substantial portion of the revenue may be required. By May 15, Nuko's stocks had fallen 11%.

On May 21, 1997, Nuko announced that its April 24 disclosures were erroneous and that those revenues would be restated. Specifically, Nuko announced that its April 24 press release overstated its 1Q97 revenue by about $4 million (63%), and understated its net loss by over 100%. Nuko explained that its $4 million overstatement consisted of $2.2 million related to new purchases from first-time customers, uncompleted customer testing, and product support obligations. Nuko also explained that $1.8 million of the overstated $4 million related to on time payment and a customer's ability to pay. Nuko also announced, but without explanation, that Gorman had left the company effective immediately. Following the May 21 announcement, Nuko's stocks continued to fall.

### B. Procedural History

On May 23, 1997, Plaintiffs initiated this securities fraud class action against Nuko, Gorman, and Kondamoori. The First Amended Complaint ("FAC") was filed on October 22, 1997. Defendants Gorman and Kondamoori moved to dismiss the FAC under Fed.R.Civ.P. 12(b)(6) and 9(b), arguing that it did not meet the pleading requirements of the PSLRA as described in *Silicon Graphics*. On July 14, 1999, this court granted Defendants' motion and dismissed the FAC without prejudice to amend.

Plaintiffs filed their SAC on September 10, 1999. In Count I, Plaintiffs allege that Gorman and Kondamoori violated Section 10(b) of the Securities Exchange Act of 1934 ("the

Act") and Rule 10b–5 promulgated thereunder. In Count II, Plaintiffs allege that Gorman and Kondamoori violated Section 20(b) of the Act (liability as controlling persons). Defendants have moved to dismiss the SAC, this time with prejudice, again arguing that the complaint falls short of the pleading requirements of the PSLRA. Defendants also ask the court to take judicial notice of selected pages from documents filed with the SEC in this matter, as well as this court's prior opinion and order entered July 14, 1999. On March 6, 2000, the court heard counsel's arguments on the motion to dismiss. For the following reasons, the court grants Defendants' motion for judicial notice, but denies Defendants' motion to dismiss the SAC.

### II. ANALYSIS

#### A. Standards Under Rule 12(b)(6) and Rule 9(b)

In considering a motion to dismiss under Rule 12(b)(6), the court must accept the truth of all factual allegations in the complaint and construe them in the light most favorable to the non-moving party. *NL Industries, Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.1986). In a securities fraud action, the court may take judicial notice of public records outside the pleadings, including SEC filings. *Silicon Graphics*, 183 F.3d at 986; *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.1986).[3] The court need not accept as true allegations that contradict facts that have been judicially noticed. *Employers Ins. of Wausau v. Musick, Peeler & Garrett*, 871 F.Supp. 381, 385 (S.D.Cal.1994).

Under Rule 9(b), plaintiffs must plead claims of fraud with particularity. Fed. R.Civ.P. 9(b). This includes claims of fraud brought under federal securities laws. *Yourish v. California Amplifier*, 191 F.3d 983, 993 (9th Cir.1999); *Hockey v. Medhekar*, 30 F.Supp.2d 1209, 1212–13 (N.D.Cal.1998).

#### B. Pleading Requirements Under the PSLRA and *Silicon Graphics*

In actions alleging violations of federal securities laws, the PSLRA imposes fur-

---

**3.** Thus, Defendants' motion for judicial notice is granted without further explanation.

ther pleading requirements. Under the PSLRA:

(1) In any private action arising under this chapter in which the plaintiff alleges that the defendant—(A) made an untrue statement of a material fact; or (b) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(1), (2). In enacting these provisions, Congress sought to reduce the number of abusive securities fraud claims filed by private plaintiffs. *See Silicon Graphics*, 183 F.3d at 973. The Ninth Circuit has explained that the PSLRA requires a private plaintiff "to plead particular facts giving rise to a strong inference of deliberate recklessness."[4] *Silicon Graphics*, 183 F.3d at 977. The facts averring deliberate recklessness must strongly suggest actual intent to commit fraud. *Id.* at 979. Pleading "motive and opportunity" or mere recklessness, without more, is insufficient. *Id.; In re Southern Pac. Funding Corp. Sec. Litig.*, 83 F.Supp.2d 1172, 1177–78 (D.Or.1999).

A few district courts within the Ninth Circuit have considered and applied the teachings of *Silicon Graphics*.[5] The facts of those cases, however, are not very similar to those in the matter at hand, and scrutinizing them does not provide much assistance in assessing the current SAC. Because *Silicon Graphics* controls in determining whether this SAC meets the PSLRA's pleading requirements, a brief explanation of relevant portions of that case is appropriate and informative.

In *Silicon Graphics*, one of the plaintiffs alleged that the company's internal reports alerted the officers of serious production and sales problems, but that the officers continued releasing contradictory positive statements to the public. *Silicon Graphics*, 183 F.3d at 984. She did not, however, allege adequate corroborating details, such as "the sources of her information with respect to the reports, how she learned of the reports, who drafted them, or which officers received them." *Id.* at 985. She also failed to include an adequate description of the contents of the internal reports. *Id.* The court opined that if the internal reports existed, the complaint "would contain at least some specifics from those reports as well as such facts as may indicate their reliability." *Id.* The court explained that it could not "ascertain whether there is any basis for the allegations that the officers had actual or constructive knowledge of [the company's] problems that would cause their optimistic representations to the contrary to be consciously misleading." *Id.* (emphasis added). Accordingly, the court held that allegations of the uncorroborated internal reports alone were insufficient to plead scienter. *Id.*

Here, Plaintiffs' principal claim is that Gorman and Kondamoori knowingly disseminated materially false and misleading information respecting Nuko's financial status for 1Q97. Specifically, Plaintiffs allege that on

---

**4.** This court is aware of the criticisms generated by *Silicon Graphics*. *See Silicon Graphics*, 195 F.3d at 521–23 (Reinhardt, J., dissenting); *Silicon Graphics*, 183 F.3d at 991–96 (Browning, J., concurring and dissenting); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1284 n. 21 (11th Cir.1999). Notwithstanding, this court is bound by *Silicon Graphics* and must adhere to its teachings.

**5.** *E.g., In re CBT Group PLC Sec. Litig.*, No. C–98–21014RMW, 1999 WL 1249287 (N.D.Cal. July 21, 1999); *Weiss v. Mentor Graphics Corp.*, No. CV–97–1376–ST, 1999 WL 985141 (D.Or. Oct.6, 1999); *Southern Pac. Funding Corp.*, 83 F.Supp.2d 1172 (D.Or.1999); *Dalarne Partners, Ltd. v. Sync Research, Inc.*, 103 F.Supp.2d 1209 (C.D.Cal.2000).

April 24, 1997, Gorman and Kondamoori announced revenues of $6.1 million for 1Q97 when they knew that $4 million of that $6.1 million had been improperly recognized. According to the SAC, Gorman and Kondamoori intentionally overstated Nuko's revenues in an attempt to obtain the Internext Agreement and to reduce the number of shares of stocks Nuko would issue to Internext under the terms of the agreement. As a result, Plaintiffs allegedly paid artificially high prices for Nuko stock during this time period (April 24, 1997, through May 21, 1997).

Gorman and Kondamoori argue that Count I of the SAC must be dismissed because Plaintiffs have not alleged: (1) a strong inference of deliberate recklessness; or (2) facts with adequate particularity showing that Defendants knew the April 24, 1997 announcement was false when made. Each of these arguments is addressed separately below.

## C. Strong Inference of Deliberate Recklessness

■ The first question is whether the SAC sets forth "in great detail facts demonstrating, at a minimum, a degree of recklessness that strongly suggests the required degree of intent." *Silicon Graphics,* 183 F.3d at 985. In other words, have Plaintiffs adequately pleaded scienter? In their attempt to satisfy this burden, Plaintiffs describe in great detail Nuko's 4Q96 financial woes, Defendants' need to increase revenues for 1Q97, and Defendants' desire to consummate the Internext Agreement. These facts strongly suggest that Defendants had motive and opportunity to overstate Nuko's revenues. Under *Silicon Graphics,* allegations of motive and opportunity, without more, do not satisfy the PSLRA's requirements for pleading scienter. *Silicon Graphics,* 183 F.3d at 979; *Southern Pac. Funding Corp.,* 83 F.Supp.2d at 1177–78. However, "motive and opportunity coupled with highly material misrepresentations or omissions may well satisfy the standard." *Southern Pac. Funding Corp.,* 83 F.Supp.2d at 1177–78.

■ Here, the SAC alleges more than mere motive and opportunity. As noted above, Plaintiffs assert that Defendants misstated Nuko's 1Q97 revenues with knowledge

that they were improperly recognizing $4 million in tentative and disputed transactions. Plaintiffs specifically identify the sources of the $4 million that should not have been recognized for 1Q97: (1) $1.3 million from Sony, where the product was still being evaluated and was not accepted; (2) $0.9 million from Hong Kong Jockey, where no firm order had even been placed; and (3) $1.8 million where IBM refused to pay for a product that failed to perform during several demonstrations.

Plaintiffs allege facts strongly suggesting that Gorman and Kondamoori knew the tentative nature of these specific transactions. First, Defendants knew that recognizing $1.3 million from Sony was improper because the products shipped to Sony were still being evaluated and had not been accepted. Defendants also knew that the $0.9 million recognized from Hong Kong Jockey was improper because Hong Kong Jockey had not even placed a firm order for the product. Defendants knew that these revenues were uncertain because Nuko employees questioned them at two staff meetings why these tentative revenues were being recognized. According to Plaintiffs, Kondamoori told these employees to "mind their own business." (SAC at ¶ 100; Plaintiffs' Opposition at 4.)

Respecting the $1.8 million from IBM, Defendants knew that recognizing this amount in 1Q97 was improper because the products shipped to IBM were defective, failed to perform during several demonstrations, and were rejected. Kondamoori himself followed the IBM project on a daily basis.

In addition, Plaintiffs explain that Gorman and Kondamoori knew that, as a general matter, reporting uncertain revenues was improper. In the February 14 conference call respecting Nuko's disappointing 4Q96 revenues, just two months before the April 24 announcement, Gorman and Kondamoori stated that Nuko did not recognize revenues from potential customers or from products shipped on a trial basis. This fact alone gives rise to a strong inference that Gorman and Kondamoori knew that recognizing tentative revenues was improper.

The court also acknowledges Plaintiffs' allegations of violations of generally accepted accounting principles ("GAAP") respecting these transactions. Plaintiffs explain that Nuko's recognition of $1.8 million from IBM violated GAAP because that $1.8 million did not constitute revenue or an account receivable. Because IBM rejected the products, it was never obligated to pay. Even if the $1.8 million were properly recognized, Plaintiffs continue, recognition was premature under GAAP. Moreover, if the $1.8 million were properly considered an account receivable, Nuko failed to disclose the tentative collectibility of that account as required by GAAP. Respecting the $1.3 million from Sony and the $0.9 from Hong Kong Jockey, Plaintiffs assert that recognizing these as revenues was premature under GAAP because neither sale was final. Finally, Plaintiffs allege generally that Nuko violated GAAP because: (1) its April 24, 1997 release was not useful to investors and creditors; (2) the April 24, 1997 release was not reliable and did not accurately represent Nuko's 1Q97 revenues; and (3) Nuko did not act with prudent conservativism in the face of the uncertainties and risks inherent in these transactions.

Although the SAC does not specify, the court assumes that Plaintiffs' allegations of GAAP violations are an attempt to establish scienter. While the court need not determine at this juncture whether these allegations constitute GAAP violations, it is well established that GAAP violations, without more, do not establish scienter, even if those GAAP violations were deliberate. *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir.1994); *Hockey v. Medhekar*, 30 F.Supp.2d 1209, 1224 (N.D.Cal.1998). In the matter at hand, Plaintiffs allege more than just GAAP violations. The facts supporting these alleged GAAP violations, in conjunction with the details described above, give rise to a strong inference that Defendants acted with deliberate recklessness.

In turn, Defendants argue that their quick correction of misstated revenues for 1Q97 negates any inference of scienter suggested by these facts. Defendants explain that Nuko acknowledged possible errors in its registration statement filed with the SEC on May 14, 1997, three weeks after the April 24 announcement and one week after closing the Internext deal. Then, on May 21, 1997, four weeks after the misstated revenues were announced and two weeks after closing the Internext deal, Kondamoori publicly announced the misstatements and corrected the results. These corrections occurred well within the 90–day Post Closing Adjustment period. Because the Internext Agreement required this Post Closing Adjustment based on the average price of Nuko stock, and the price of Nuko's stock had fallen dramatically by then, Defendants argue that they received no benefit from the erroneous April 24 release.

Although attractive, Defendants' argument does not convince this court. This argument suggests that Defendants' alleged attempt to commit fraud was short-lived and basically unsuccessful. The fact that Defendants eventually followed their accountants' recommendation to restate 1Q97 revenues does not negate the strong inference of deliberate recklessness raised by the allegations set forth in great detail in the SAC.

Defendants also argue that the SAC fails to allege that either Gorman or Kondamoori sold or traded any stocks during the relevant time period. If Defendants did not sell or trade at the artificially inflated prices, they contend, they could not have received any benefit from overstating revenues. The fact that they did not profit from selling or trading, they conclude, negates any inference of deliberate misconduct.

Again, the court is not persuaded. Plaintiffs have not alleged that Defendants engaged in insider trading during the relevant time period. If so, the failure to allege selling or trading could negate the inference of intent. *See Silicon Graphics*, 183 F.3d at 986. A fair reading of this SAC does not suggest claims of insider trading. Rather, Plaintiffs' claim is that Defendants knowingly overstated revenues for 1Q97 in an attempt to inflate Nuko's stock prices and secure a deal with Internext. Plaintiffs relied on Defendants' misstated revenues and purchased Nuko stocks at inflated prices. Under these circumstances, the absence of Defendants' selling or trading has little bearing on deter-

mining whether Plaintiffs' have adequately pleaded scienter.

In sum, the court is convinced that the SAC meets *Silicon Graphics'* minimum requirements for pleading scienter. The SAC contains particular facts giving rise to a strong inference of deliberate recklessness in misstating Nuko's 1Q97 results.

### D. Adequate Particularity of Facts

█ Gorman and Kondamoori also argue that the SAC does not set forth facts with adequate particularity showing that they knew the April 24, 1997 announcement was false when made. Defendants assert that the SAC "adds insignificant new allegations which consist of nothing more than listing Nuko's customers and the anticipated revenue from sales to such customers." (Def. Motion to Dismiss at 2.) After carefully examining both the FAC and the SAC, the court disagrees.

In its prior opinion and order dismissing the FAC, the court specifically instructed Plaintiffs to "identify the specific revenue that was falsely recognized, including the specific customer transactions that were involved, the specific reasons why the recognition of that revenue was improper and in violation of particular provisions of GAAP, and the specific facts to establish why the Defendants knew that such revenue recognition was improper at the time the public statements were made." (Order, July 14, 1999, at 15, ln. 12–16.) The court is satisfied that Plaintiffs have followed the court's instructions and have pleaded with adequate particularity the facts strongly suggesting that Defendants knew the April 24, 1997 revenue statements were false or misleading when made.

Respecting the $1.8 million IBM transaction, the SAC alleges that Kondamoori closely followed the IBM project "on a daily basis." (SAC at ¶ 77.) Because he was so involved in the project, he knew that the product (the Highlander) had failed during several demonstrations and that IBM was never obligated to purchase the defective product. (SAC at ¶¶ 77, 101.) Plaintiffs explain that the final unsuccessful demonstration of the defective Highlander occurred in Washington, D.C., "well before" the 1Q97 results were released on April 24, 1997. (Plaintiffs' Opposition at 15 n.3.)

Additionally, the SAC alleges that in two staff meetings conducted by Kondamoori, employees asked why Nuko was recognizing revenue from the Sony transaction, where testing of the product was not complete and had not yet been accepted. In those meetings, employees also asked why Nuko was recognizing the Hong Kong Jockey revenues, where the customer had not even placed a firm order. Gorman and Kondamoori knew that Sony and Hong Kong Jockey were "new customers" who had received the products on a trial basis. (SAC at ¶¶ 3, 55.) Kondamoori told the employees to "mind their own business." (SAC at ¶¶ 6, 100.)

Reading these facts in the light most favorable to Plaintiffs and drawing reasonable inferences therefrom, Plaintiffs have minimally met their burden of pleading facts strongly suggesting that Defendants knew that the 1Q97 results released on April 24, 1997, were false when released. Plaintiffs have provided specific facts from which the court can discern "any basis for alleging that the officers knew that their statements were false at the time they were made." *Silicon Graphics*, 183 F.3d at 985 (emphasis added). Based on the "overall presentation of the complaint," *Southern Pac. Funding Corp.*, 83 F.Supp.2d at 1178, Plaintiffs have satisfied their burden of pleading that Defendants knew the April 24, 1997 release was false when released.

### E. Section 20(b) Claims

Finally, the court rejects Defendants' argument that Count II of the SAC must be dismissed. The sole basis for dismissal of this claim that Gorman and Kondamoori are liable as "controlling persons" under Section 20(b) of the Act is Defendants' assertion that the SAC fails to state a predicate violation of Section 10(b). Because the court has concluded otherwise, the court will deny Defendants' request to dismiss Count II.

### III. ORDER

For the foregoing reasons, Defendants' Motion for Judicial Notice is hereby

GRANTED. Defendants' Motion to Dismiss the Second Amended Complaint is hereby DENIED.

IT IS SO ORDERED.