**In re RAMP NETWORKS, INC. SECURITIES Litigation.**

**This Document Relates to all Actions.**

**No. C–00–3645 JCS.**

United States District Court, N.D. California.

March 1, 2002.

Lionel Z. Glancy, Glancy & Binkow LLP, Los Angeles, CA, for Plaintiff.

Steven S. Kaufhold, Brobeck Phleger & Harrison LLP, San Francisco, CA, Paul R. Bessette, Brobeck Phleger & Harrison LLP, Austin, TX, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT WITH LIMITED LEAVE TO AMEND

SPERO, United States Magistrate Judge.

Defendants' Motion to Dismiss Second Amended Complaint ("the Motion") came on for hearing on Friday, January 25, 2002, at 9:30 a.m. For the reasons stated below, Defendants' Motion is GRANTED and Plaintiffs' Second Amended Complaint is DISMISSED, in part with leave to amend and in part without leave to amend.

## I. *INTRODUCTION*

Plaintiffs bring this securities class action on behalf of public investors who purchased securities from Ramp Networks, Inc. ("Ramp") during the class period from November 15, 1999, through September 29, 2000. Second Amended Complaint ("SAC") at 1, ¶ 1. Plaintiffs allege that Ramp "manipulated the Company's financial and accounting systems and materially overstated Ramp's publicly-reported financial results throughout the Class period." SAC at 1, ¶ 3. Plaintiffs are suing Ramp and two individual defendants, Mahesh Veerina (CEO, President and Chairman of the Board of Ramp throughout the class period) and Timothy McElwee (Vice–President of Worldwide Sales for Ramp until March 31, 2000), for allegedly making false and misleading statements or omissions in violation of § 10(b) of the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 10(b)(5). SAC at 53, ¶ 110. Plaintiffs also allege claims under § 20(a) of the 1934 Act against Veerina and McElwee.

Defendants bring this Motion on the basis that Plaintiffs have not alleged suffi-

cient facts under the stringent pleading requirements established by Congress in the Private Securities Litigation Reform Act of 1995 ("PSLRA") and under Fed. R.Civ.P. 9(b).

## II. *BACKGROUND*

### A. *Facts*

#### 1. *History and Performance of Ramp*

Prior to its acquisition by Nokia Corporation, in January 2001, Ramp was a Delaware corporation with its headquarters in Santa Clara, California. SAC at 5, ¶¶ 13, 15. On June 22, 1999, Ramp completed an Initial Public Offering ("IPO") of 3,853,000 shares. SAC at 10, ¶ 35. Ramp is a provider of "shared Internet access solutions for the small office market." SAC at 5, ¶ 14. Ramp has designed a line of products called WebRamp. SAC at 11, ¶ 37. In 1999, Ramp began shifting from the first generation of WebRamp products, using analog modems and ISDN lines, to its second generation of WebRamp products, which focused on broadband technologies such as DSL and cable modems. SAC at 11, ¶ 39. In particular, Ramp began offering "broadband platforms that incorporated security features designed to prevent unauthorized access to small office networks using shared Internet connections." *Id.* As the demand for analog products declined, investor reports issued by Kaufman Bros., L.P. indicated that the investment community valued Ramp primarily for its broadband and security business. *Id.*

On November 16, 1999, Ramp issued a press release stating that it had conducted a survey that revealed that "DSL service is quickly emerging as the broadband technology of choice for small businesses." November 16, 1999 Press Release, Exh. J to Defendant's Request For Judicial Notice;[1] *See also* SAC at 14, ¶ 44. According to the press release, these survey results "confirm[ed] the overwhelming commitment from [Internet Service Providers], carriers and [Value–Added Resellers] to bring DSL service to their small business customers, and validate[d] Ramp's strategy to provide the most scalable platform for software and corporate-class services, independent of access method." *Id.*

On February 9, 2000, Ramp announced its fourth quarter and fiscal year results for 1999 in another press release. February 9, 2000 Press Release, Exh. J to Defendants' Request For Judicial Notice; *see also* SAC at 15, ¶ 46. According to the press release,

> Revenues for the fourth quarter of 1999 were $4.8 million, an increase of 62% over revenues of $3.0 million for the fourth quarter of 1998. For the year ended December 31, 1999, Ramp reported revenues of $18.2 million, an 85% increase over revenues of $9.9 million reported for the year ended December 31, 1998.

*Id.* The President and CEO of Ramp, Mahesh Veerina, was quoted in the press release as saying "[w]e are pleased with our year over year growth of 85% . . . ." *Id.* Veerina went on to say that "[w]e also saw strong progress in the fourth quarter in expanding the broadband product portfolio, adding the WebRamp 600i ADSL router and the WebRamp 450i IDSL router to complement the WebRamp 500i and 510i

---

1. The Court grants Defendants Request For Judicial Notice on the basis that all of the documents attached thereto are either: 1) public disclosure documents that were filed with the SEC; or 2) press releases and reports that were explicitly referenced in the complaint. *See Ronconi v. Larkin,* Fed.Sec. L.Rep. (CCH) ¶ 90,212, at 90, 888, 1998 WL 230987 (N.D.Cal. May 1998) (holding that the court may take judicial notice of public disclosure documents filed with the SEC and the full text of documents cited in the complaint).

SDSL products that we began shipping Q3." *Id.* On the basis of Ramp's 1999 revenues, Veerina was awarded a $39,000 bonus and 96,000 stock options. SAC at 52, ¶ 107. Veerina's salary in 1998 and 1999 was $140,000/year. *Id.*

On March 30, 2000, Ramp filed with the SEC its annual report for the year ended December 31, 1999, on Form 10–K. SAC at 14, ¶ 48; *see also* 1999 10–K, Exh. A to Request For Judicial Notice. Ramp stated that its revenues increase 85% to $18.2 million for that year, from $9.9 million in revenues in the previous year. *Id.* at 27. According to Ramp, the "increase was primarily due to increased sales of the Company's WebRamp 200 and 300 series of analog products as well as sales of the new ISDN WebRamp 410i product and the WebRamp 700 series for security." *Id.* Ramp also stated that "revenue growth was reported in all geographic regions, with particular strength in North America." *Id.*

On March 31, 2000, Ramp's Vice President of World Wide Sales, Timothy J. McElwee, was fired after he was "nailed" for high product returns. SAC at 28, ¶ 60(a). Sometime during the Class Period, McElwee sold 92,000 shares of Ramp common stock. SAC 7, ¶ 23 (alleging that "[d]uring the Class Period, Defendant McElwee sold approximately 92,000 shares of Ramp common stock at artificially inflated prices, while in possession of undisclosed, materially adverse information about the Company").

On April 25, 2000, Ramp issued a press release reporting revenues for the first quarter of 2000. April 25, 2000 Press Release, Exh. J to Request For Judicial Notice; *see also* SAC at 20, ¶ 53. According to that press release, "[r]evenues for the first quarter of 2000 were $5.6 million, an increase of 44% over revenues of $3.9 million for the first quarter of 1999." *Id.* Veerina was quoted in the April 25, 2000

press release as stating that "DSL orders and shipments drove our revenue growth this quarter. . . . Orders for our broadband solutions exceeded our expectations and we are increasing production to meet the demand." *Id.*

Ramp's apparent success with its broadband products was reflected in an analyst report by Dain Rauscher Wessels issued May 31, 2000. Exh. K to Request for Judicial Notice; *see also* SAC at 35, ¶ 70. The report stated:

> We caught up with Ramp's management to discuss the status of the company's June quarter along with some of the recently announced product and sales initiatives. We believe the quarter is tracking ahead of expectations and we remain very comfortable with our June quarter and fiscal 2000 estimates. . . . We remain optimistic with respect to the opportunities available to Ramp and believe that the company is executing on its plan of becoming a significant provider of value-added DSL CPE equipment.

*Id.*

On July 25, 2000, Ramp announced that its was postponing release of its earnings for second quarter 2000, originally scheduled for July 25, by one day. July 25, 2000 Press Release, Exh. J to Defendant's Request For Judicial Notice; *see also* SAC at 35, ¶ 71. The next day, Ramp released second quarter 2000 earnings in a press release which stated as follows:

> Ramp shipped a record $8.3 million of product in the second quarter of 2000. The company posted more than 60% sequential growth in broadband/security product revenue quarter over quarter. Revenues recorded for the second quarter were $5.8 million, an increase of 27% over revenues of $4.5 million for the second quarter of 1999, and an increase of 4% over revenues of 5.6 million for the first quarter of 2000. For the six

months ended June 30, 2000, Ramp reported revenues of $11.3 million, an increase of 35% over revenues of $8.4 million reported for the six months ended June 30, 1999.

July 26, 2000 Press Release, Exh. J to Defendants' Request For Judicial Notice.

A Dain Rauscher Wessels report issued on July 27, 2000, expressed disappointment with Ramp's second quarter 2000 performance:

> Ramp Networks released disappointing 2Q00 results yesterday as analog product sales declined much faster than expected. Revenues were $5.77 million, up 3.3% sequentially from $5.58 million in the prior quarter but $1.2 million shy of our $6.98 million estimate. The shortfall was entirely in analog product sales, which came in at $1.96 million, down 36% sequentially and $1.18 million short of our $3.14 million estimate. Broadband and security product sales were strong, up 51.4% sequentially and in line with our estimate.
>
> Balance Sheet: This quarter, the balance sheet has become a major issue for Ramp. The company shipped $8.3 million worth of product in the quarter, but only recognized $5.77 million as sell through of analog products slowed to a trickle. Much of the balance, $1.35 million was booked as deferred revenue. This, combined with a few slow-paying customers and a back-end weighted manufacturing ramp for broadband products, led to an increase in DSO to 141 days from 98 days. Inventory turns fell to 3.9x from 4.5x as the company stocked components to alleviate component shortages. Cash fell to $21.6 million from $32.7 million.

July 27, 2000 Dain Rauscher Wessels Report, Exh. K to Defendants' Request For Judicial Notice; see also SAC at 13, ¶ 43.

Another analyst report, prepared by Chase H & Q, came to similar conclusions:

> We are downgrading Ramp to Market Perform from BUY. Ramp announced a Q2 00 shortfall of ($0.33)/share on $5.8 million in revenue to our estimate of ($0.25)/share on $7M in revenue; ... The shortfall resulted from declines in sales of analog products by resellers as well as longer—[than]—expected sales cycles with large enterprise and carrier accounts. Despite the revenue shortfall, the company actually shipped slightly more than $7 million in product. However, a large portion of the product shipped to resellers did not sell out of the channel and therefore the company did not recognize the revenue. In addition to deferring sales, the company wrote off about $900K for bad debt expenses, for uncollectible accounts receivable that were more than 90 days old. We are lowering our rating on Ramp to reflect a severe deterioration in fundamentals.

July 27, 2000 Chase H & Q Report, Exh. L to Defendants' Request For Judicial Notice.

On August 14, 2000, Ramp filed its quarterly report on Form 10–Q for the second quarter of 2000. SAC at 35, ¶ 72; see also Exh. E to Request For Judicial Notice. In that report, Ramp stated that:

> Revenue increased 27% to $5.8 million in the three months ended June 30, 2000 from $4.5 million in the three months ended June 30, 1999. The increase was primarily due to continued growth in the WebRamp 700 series of security products and growth in our Broadband products dominated by the Company's line of SDSL and ADSL products servicing the "broadband" market.

*Id.* Ramp reported that 35% of its revenues in the second quarter were derived from sales to a Chinese company, Xiao Tong Electronics Company. *Id.*

On September 29, 2000, Ramp issued a press release announcing that it expected revenues and earnings for the third quarter 2000, ending September 30, to be "significantly lower" than the revenue and earnings recorded in the prior quarter, ending June 30, 2000. September 29, 2000 Press Release, Exh. J to Defendants' Request For Judicial Notice; *see also* SAC at 46, ¶ 86. Specifically, the press release stated that Ramp expected that third quarter revenues would not exceed $1 million. *Id.* The press release also stated that Ramp planned to restructure its operations. *Id.* Apparently in response to the announcement, Ramp's stock price fell again, from $3.5312/share at the close of trading on Friday, September 29, 2000 to $2.375/share at the open of trading on Monday, October 2, 2000. SAC at 46, ¶ 89.

### 2. *Ramp's Revenue Recognition Policy*

On November 14, 2000, Ramp filed its quarterly report for the third quarter ending September 30, 2000. November 14, 2000 Quarterly Report, Form 10 Q, Exh. F to Defendants' Request For Judicial Notice; *see also* SAC at 49, ¶¶ 97–98. In that report, Ramp explained that it had decided to abandon its previous accounting practice of recognizing revenue at the time products were shipped in favor of a policy under which revenue would not be recognized until it was "sold through" to customers. *Id.* at 7. The report explained the change in accounting practices as follows:

> Historically, revenue has been recognized by the Company upon transfer of title and risks of ownership, which generally occurred upon product shipment. Certain agreements with distributors and retailers provide for rights of return, co-op advertising, price protection and stock rotation rights. Under the guidelines and requirements of Statement of Financial Accounting Standards ("SFAS") 48, "Revenue Recognition

When Right of Return Exists," the Company concluded that it had sufficient history and experience to quantify reserves required for these provisions. Accordingly, Ramp provided an allowance for returns and price adjustments and provided a warranty reserve at the point of revenue recognition. These reserves had been adjusted periodically based upon historical experience and anticipated future returns, price adjustments, and warranty costs.

In the first quarter of 2000, the Company launched a new sales and marketing campaign that involved sales of new technology and products to both existing and a variety of new types of customers, including new customers serving the relatively new Digital Subscriber Loop (DSL) market. The DSL market experienced significant fluctuations in supply and demand in 2000. As a result, current customers and potential customers experienced delays in the provisioning of this marketplace which delayed demand for the Company's products. During 2000 the Company has experienced changing business conditions and demand for product from its distributors. Specifically, the Company experienced lower demand for both new and existing products and a trend of increasing past due accounts receivable from its current distributors as well as from some of the company's new customers. The Company has now decided that this increase in past due accounts receivable from distributors was a result of the distributors not paying the company until product was ultimately "sold through" to the customers. Additionally, certain new customers returned a significant portion of previously sold product in amounts greater than had been estimated by the Company.... In the third quarter of 2000, the Company reassessed its receivable collection history and product re-

turns history with its major distributors as well as new customers, based upon the current market demand for the Company's products. As a result of this reassessment, the Company determined that the negative trends in product sales demand and delayed collection of receivable amounts was not a temporary trend. These significant changes in circumstances have necessitated a change in accounting policies for its current sales activity. The Company has decided to restate earlier quarters so that the accounting revenue is consistent for all interim periods in 2000.

The Company determined that given the current market, a more preferable method of revenue recognition would be to defer the recognition of revenue. Under this new method, the Company will now record revenue on product shipped to distributors when the product is ultimately "sold through" to the customer. Additionally, the Company will now defer revenues for all other customers where collection and returns history is not proven until such activity reflects the "sell through" of products by Value–Added Resellers ("VAR") and Managed Service Providers ("MSP").

*Id.* at 7–8.

Applying the new accounting practice, Ramp reported revenues of $3 million for the third quarter of 2000 ending September 30. *Id.* at 4. Although these revenues reflected a 41% decrease as compared to the same quarter for the previous year, they were substantially higher than predicted in Ramp's September 29, 2000 Press Release. SAC at 50, ¶ 99. The September 29 press release reported that Ramp expected its third quarter earnings to be "no higher than $1 million." September 29, 2000 Press Release, Exh. J to Defendants' Request For Judicial Notice.

On November 14, 2000, Ramp also filed amended quarterly reports for the first and second quarters of 2000 restating revenues under the new accounting policy, which Ramp applied retroactively beginning January 1, 2000. Exh. G (First Quarter 2000) and H (Second Quarter 2000) to Request For Judicial Notice; *see also* SAC at 31, ¶ 64 (amended report for first quarter 2000) and 41, ¶ 78 (amended report for second quarter 2000). The Amended Quarterly Report for the first quarter of 2000 reflected that revenues declined by 9% relative to the same quarter in 1999 to $3.5 million (rather than increasing by 44% to $5.6 million, as previously reported). November 14, 2000 10–Q/A Form, Amended Quarterly Report at 5, Exh. G to Defendants' Request For Judicial Notice. For the second quarter of 2000, Ramp reported restated revenues of $5 million—an increase of 9.8% over the previous year—rather than the 27% increase to $5.8 million that was previously reported. Amended Quarterly Report, Form 10–Q/A at 5, Exh. G to Defendants' Request For Judicial Notice.

### B. *The Complaint*

This class action lawsuit originated as three lawsuits filed between October 3, 2000, and October 23, 2000, which were consolidated on January 9, 2001. *See* Order Consolidating Related Actions Against Ramp Networks, Inc. and Mahesh Veerina, filed January 9, 2001. Following consolidation, Plaintiffs filed their Consolidated Amended Complaint For Violation Of Federal Securities Law ("CAC"). Defendants brought a Motion To Dismiss, and on June 22, 2001, the Court granted Defendants' Motion to Dismiss with leave to amend. Plaintiffs filed a Second Amended Complaint on August 6, 2001. The sufficiency of the allegations in the Second Amended Complaint is the subject of this Motion.

In the section of their SAC entitled "Summary of Action," Plaintiffs allege that Defendants "manipulated the Company's financial and accounting systems and materially overstated Ramp's publicly-reported financial results throughout the Class Period." SAC at 1, ¶ 3. Plaintiffs allege that Defendants' "revenue figures for the first and second quarters of 2000 unreasonably failed to take into account expected returns of product" because:

1) Ramp "dumped [products] on distributors who were paid to accept and store Company merchandise for revenue recognition purposes and then instructed to remove the shrink wrap from Ramp products (to convey the false impression that products had been 'sold through' or used) before returning them to the Company as defective." SAC at 2, ¶ 4(a).

2) Defendants "shipped [products] to other companies for revenue recognition purposes near the end of quarterly or monthly reporting periods with the understanding that the 'buyers' would simply store the merchandise at Ramp's expense before returning the merchandise for full credit after the close of the Company's reporting period." SAC at 2, ¶ 4(b).

3) Defendants "temporarily removed [products] from Ramp's DisCopy Labs ("DCL") warehouse facility in Fremont, California by 'sweeper' trucks which arrived on the last day of each quarter to move product off the loading docks in order to book the 'sales' of these products as revenue for the quarter. SAC at 2, ¶ 4(c)."

Plaintiffs further allege that Defendants violated SFAS No. 48 by booking sales as revenue before the product's price was fixed or determinable. SAC at 4, ¶ 5. In particular, Plaintiffs alleged that Ramp: 1) shipped product on the "slightest of verbal commitments;" 2) shipped product "before a prospective buyer had tested Company equipment or agreed to price and payment terms;" and 3) sent products to local distributors, who were paid by Ramp to store the product pending execution of the deal; these products were treated as returns if no deal was executed. SAC at 3, ¶ 5.

Plaintiffs allege that Defendants also violated SFAS No. 48 by booking sales that were, in fact, contingent sales as revenue. SAC at 3, ¶ 6. Plaintiffs allege that such sales were made to distributors that included Ingram Micro, Tech Data, Merisel, Merit, Multiple Zones, Inc., and Synnex. *Id.* According to Plaintiffs, these distributors were not required to pay Ramp for product until sold through to resellers or ultimate consumers. *Id.*

Finally, Plaintiffs allege that Ramp violated SFAS No. 48 by making sales to distributors that entailed "significant obligations to assist in product resale." SAC at 3, ¶ 7. Plaintiffs allege that one such deal, for between $900,000.00 and $1,000,000.00 in product, was made with Telsource. *Id.* When resale efforts were unsuccessful, the product was returned and Ramp's Vice President of Sales, Gary Metalonis, was fired. *Id.*

According to Plaintiffs, Defendants were aware of these fraudulent practices yet nonetheless deliberately "portrayed Ramp as a booming company which was experiencing and would continue to experience rapidly rising product sales." SAC at 3, ¶ 8. On the basis of these allegations, Plaintiffs bring claims under §§ 10(b) and 20(a) of the 1934 Act.

### C. *Defendants' Motion To Dismiss*

Defendants move to dismiss Plaintiff's Second Amended Complaint on the grounds that Plaintiffs fail to allege sufficient specific facts to give rise to a strong

inference that Defendants made false or misleading statements or omissions with deliberate recklessness, as is required by the Ninth Circuit under *In re Silicon Graphics*, 183 F.3d 970, 979 (9th Cir.1999). Defendants argue further that: 1) some of the alleged misrepresentations are non-actionable because they are mere "puffery" or are protected by the "bespeaks caution doctrine;" 2) there is no loss causation because the restatements of revenues that led to a drop in prices occurred after the class period ended; and 3) Plaintiffs fail to state claims under § 20(a) on the basis of "control person" liability because they have failed to adequately allege claims under § 10(b).

In their Opposition, Plaintiffs argue that they have alleged sufficient specific facts to show scienter on the part of all Defendants and to meet the pleading requirements for securities fraud claims. Specifically, Plaintiffs argue that: 1) Ramp's third quarter restatement of revenues constituted an admission that it made false and misleading statements concerning both the magnitude of its revenues in the first and second quarters of 2000 and its adherence to the requirements of SFAS No. 48; 2) Ramp's allegations concerning specific improperly booked transactions satisfy the pleading requirements of Rule 9(b) and the PSLRA; 3) Plaintiffs have alleged specific facts establishing multiple violations of SFAS No. 48, which in turn, gives rise to an inference of scienter; and 4) Plaintiffs have alleged additional facts, beyond the Generally Accepted Accounting Principles ("GAAP") violations, indicating the existence of deliberate recklessness. Plaintiffs further argue that Defendants' statements were neither "forward-looking" nor "puffery" and therefore are not protected. In addition, Plaintiffs assert that they have sufficiently alleged loss causation. Finally, they assert that they have alleged sufficient facts to establish "control person" liability under § 20(a).

## III. *ANALYSIS*

### A. *Pleading Standards For Section 10(b) and 20(a) Claims*

#### 1. *Section 10(b) Claims*

Section 10(b) of the 1934 Act provides that:

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mail, or of any facility of any national security exchange ... to use or employ, in connection with the purchase or sale, of any security registered on a national securities exchange ... any manipulative or deceptive device in contrivance or contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Rule 10b–5, promulgated under § 10(b), provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

17 C.F.R. § 240.10b–5(b). The elements of a § 10(b) claim are: 1) a false statement or an omission of a material fact; 2) reliance; 3) scienter; and 4) resulting damages. *Paracor Finance v. General Electric Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir.1996); *see also In re Polaroid*, 2001 WL 311224 (D.Mass.2001) (holding that statement is "material" if a "reasonable investor would have viewed the misrepresentation or omission as having significantly altered the total mix of information

made available"). If one of these elements is not present, the claim fails. *Id.*

Claims alleging fraud under § 10(b) must meet the heightened pleading requirements of Fed.R.Civ.P. 9(b), which requires that "in all averments of fraud or mistake the circumstances constituting fraud or mistake shall be stated with particularity." *See Greebel v. FTP Software, Inc.,* 194 F.3d 185, 192 (1st Cir.1999). As part of the Private Securities Litigation Reform Act ("PSLRA"), Congress clarified and strengthened the particularity requirements of Rule 9(b) as applied in the context of federal securities class action lawsuits. *Id.* Under the PSLRA, to survive a motion to dismiss, a complaint for violation of the federal securities laws must meet the heightened pleading requirements set forth under 15 U.S.C. § 78u–4(b).

First, the complaint must specify each false or misleading statement and why each statement is false or misleading. 15 U.S.C. § 78b–4(b)(1). As the court explained in *In re Oak Technology Securities Litigation,* "[i]n some cases involving fraud, a plaintiff may explain why a statement is false or misleading by merely pointing to facts that were later revealed which, due to their nature, were necessarily in existence at the time the statements were made." 1997 WL 448168 (N.D.Cal.) at *3 (citing to *In re GlenFed Inc. Securities Litigation,* 42 F.3d 1541, 1548 (9th Cir.1994) (discussing example of a house built on landfill). More typically, however, securities fraud claims involve an intervening event "such as a decline in consumer demand for the company's products or the appearance of new competitors, that occurs between the time of the statement and the time the sobering facts are revealed." *Id.* In the latter situation, the plaintiffs must explain why a statement was untrue *at the time that it was made. Id.* This is usually accomplished by identifying inconsistent contemporaneous statements or information. *Id.*

Second, with respect to each act or omission, the plaintiffs must set forth particular facts that give rise to a "strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The Ninth Circuit held in *In re Silicon Graphics,* that in order to satisfy this scienter requirement for § 10(b) claims, the plaintiffs must plead "in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." 183 F.3d 970, 974 (9th Cir.1999).

While the PSLRA does not define what is meant by a "strong" inference of scienter, "strong must mean something more than merely 'reasonable.'" *In re VISX, Inc. Securities Litigation,* 2001 WL 210481 (citing to *Silicon Graphics,* 183 F.3d at 984). "The allegations of a complaint cannot give rise to a strong inference of scienter if a court concludes that the facts pled more strongly support an inference of no wrongdoing." *Id.* In determining whether or not a strong inference of scienter has been established, "a court should not consider each relevant factual allegation solely in isolation ... but rather, as a part of the overall factual picture painted by the complaint." *In re MicroStrategy Inc. Securities Litigation,* 115 F.Supp.2d 620, 631 (E.D.Va.2000).

The PSLRA also does not define the level of recklessness that must be shown for § 10(b) claims. However, the Ninth Circuit has defined "recklessness" in this context as follows:

> Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Howard v. Everex Systems Inc.,* 228 F.3d 1057, 1064 (9th Cir.2000) (quoting *Hollinger v. Titan Capital Corp.* 914 F.2d 1564, 1569 (9th Cir.1990) (en banc)). Thus, to plead a strong inference of recklessness, "plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity." *Silicon Graphics,* 183 F.3d at 974.

#### 2. *Section 20(a) Claims*

Section 20(a) of the 1934 Act provides for derivative liability of those who "control" others found to be primarily liable under the 1934 Act. 15 U.S.C. § 78t(a). Where a plaintiff alleges a § 20(a) claim based on an underlying violation of § 10(b) of the 1934 Act, the pleading requirements for the § 20(a) claim are the same as they are for the § 10(b) claim. *See Greebel,* 194 F.3d at 206 (affirming dismissal of § 20(a) claim based on § 10(b) claim where plaintiffs had not sufficiently alleged § 10(b) claim).

### B. *Particularity and Sufficiency of Allegations in SAC*

#### 1. *Identification of Statements at Issue*

In order to survive a motion to dismiss, Plaintiffs are required to identify the specific statements alleged to be false and misleading in violation of § 10(b). *See* 15 U.S.C. § 78b–4(b)(1). Although numerous statements are cited in the SAC, Plaintiffs clarified at oral argument that their claims are based only on: 1) statements of Ramp's past revenues; 2) statements that Ramp adhered to the requirements of SFAS No. 48; and 3) statements characterizing past demand for Ramp's prod-

**2.** Even if Plaintiffs were to base their § 10(b) claims on other statements quoted in their SAC, those statements would not be actionable, either because they are forward-looking statements that are protected under the PSLRA or because they are "puffery." *See* 15 U.S.C. § 78u–5 (safe harbor for forward look-

ucts.[2] Based on Plaintiffs' representation at oral argument, the Court identifies the following statement as the ones alleged by Plaintiffs to be false and misleading:

#### REPORTS FILED WITH SEC

*1999*

● Ramp's 1999 Annual Report (Form 10–K, filed March 2000), stating that:

1. Revenues increased 85% to $18.2 million for the year ended December 31, 1999, from $9.9 million for the year ended 1998. SAC at 14, ¶ 48.

2. Ramp has reviewed the requirements for SFAS No. 48, 'Revenue Recognition When Right of Return Exists,' and has concluded that they have sufficient history and experience to quantify reserves required for these provisions. SAC at 15, ¶ 49.

*2000*

● Ramp's Form 10–Q for first quarter of 2000 (filed May 11, 2000), stating that:

1. Revenue increased 44% to $5.6 million in the three months ended March 31, 2000 from $3.9 million in the three months ended March 31, 1999. SAC at 20, ¶¶ 54.

2. Ramp has reviewed the requirements for SFAS No. 48, 'Revenue Recognition When Right of Return Exists,' and has concluded that they have sufficient history and experience to quantify reserves required for these provisions. SAC at 25, ¶ 57.

ing statements accompanied by meaningful cautionary statements); *In re Syntex Corp. Sec. Litig.,* 855 F.Supp. 1086, 1096 N.D.Cal. 1994) (holding that statements are not actionable under § 10(b) where they are "so vague and amorphous that no reasonable investor could rely on them").

- Ramp's Form 10–Q for second quarter of 2000 (filed August 14, 2000), stating that:
  1. Revenue increased 27% to $5.8 million in the three months ended June 30, 2000 from $4.5 million in the three months ended June 30, 1999. SAC at 35, ¶ 35, 72;
  2. Ramp has reviewed the requirements for SFAS No. 48, 'Revenue Recognition When Right of Return Exists,' and has concluded that they have sufficient history and experience to quantify reserves required for these provisions. SAC at 39–40, ¶ 75.

### PRESS RELEASES

#### Re: Ramp's 1999 Financial Results

- February 9, 2000 Press Release, stating that:

Revenues for the fourth quarter of 1999 were $4.8 million, an increase of 62% over revenues of $3.0 million for the fourth quarter of 1998. For the year ended December 31, 1999, Ramp reported revenues of $18.2 million, an 85% increase over revenues of $9.9 million reported for the year ended December 31, 1998. SAC at 14, ¶ 46–47.

#### Re: Ramp's 2000 Financial Results

- April 25, 2000 Press Release, stating that:

Revenues for the first quarter of 2000 were $5.6 million, an increase of 44% over revenues of $3.9 million for the first quarter of 1999.... Orders for our broadband solutions exceeded our expectations and we are increasing production to meet the demand. SAC at 20, ¶ 53;

- July 26, 200 Press Release, stating that:

Revenues recorded for the second quarter were $5.8 million, an increase of 27% over revenues of $4.5 million for the second quarter of 1999, and an increase of 4% over revenues of $5.6 million for the first quarter of 2000. For the six months ended June 30, 2000, Ramp reported revenues of $11.3 million, an increase of 35% over revenues of $8.4 million reported for the six months ended June 30, 1999. SAC at 35, ¶ 71.

To the extent that Plaintiffs' claims are based on the allegation that other statements quoted in their SAC violated § 10(b) or § 20(a), those claims are dismissed with prejudice.[3]

#### 2. *Allegations Showing Statements Were False When Made*

In order to satisfy the pleading requirements of Fed.R.Civ.P. 9(b) and the PSLRA, Plaintiffs must show why each of the statements listed above was false and misleading at the time it was made. 15 U.S.C. § 78–u4(b)(1). Plaintiffs assert that they have satisfied this requirement, relying heavily on Defendants' restatement of revenues for the first and second quarters of 2000, which Plaintiffs argue constitutes an admission that Ramp improperly recognized revenues in those quarters. Plaintiffs argue further that they have alleged specific facts concerning several transactions showing that revenue for the first two quarter of 2000 was improperly booked, in violation of SFAS No. 48, thus supporting the conclusion that Ramp's statements concerning the amount of its revenues and adherence to SFAS No. 48 were false at the time they were made. Finally, Plaintiffs assert that to the extent

---

**3.** Hereinafter, all of the statements listed above *except* the second sentence of the April 25, 2000 press release are referred to collectively as "the statements concerning revenues and adherence to SFAS No. 48." The second sentence of the April 25, 2000 press release is referred to as "the demand statement."

Ramp's April 25, 2000 press release cited to increased demand for its products, this statement was false because Ramp knew at the time the statement was made that its products were not selling through to end-users.

### a. *Restatement of Revenues*

█ According to Plaintiffs, Ramp's restatements of its first and second quarter 2000 revenues amount to admissions that its earlier revenue figures for those periods—as well as Ramp's representations in their reports filed with the SEC that Ramp adhered to all of the requirements of SFAS No. 48—were false when made. *See* SAC at 20–21, ¶ 55; SAC at 36, ¶ 73; Opposition at 18. Defendants, on the other hand, argue that Ramp's restatements do not establish that its earlier statements were false when made because the restatements were necessitated by changed circumstances. Reply at 6. The Court finds that although the restatements provide some evidence that Ramp's statements concerning its revenues and adherence to SFAS No. 48 in 2000 were false when made, the restatements are not by themselves sufficient to show that these statements were false when made.[4]

In arguing that the restatements show that Ramp's statements were false when made, Plaintiffs rely on several cases in which courts have held that an accounting restatement is sufficient to show that an earlier statement was materially false when made. *See* Opposition at 18 (citing *In re Polaroid Corp. Sec. Lit.,* 134 F.Supp.2d 176 (D.Mass.2001); *Chalverus v. Pegasystems, Inc.,* 59 F.Supp.2d 226 (D.Mass.1999); *In re SmarTalk Teleservices Inc. Sec. Lit.,* 124 F.Supp.2d 527 (S.D.Ohio 2000); *In re Sunbeam Sec. Lit.,* 89 F.Supp.2d 1326 (S.D.Fla.1999)). Three of the cases relied on by Plaintiffs are

distinguishable because the restatements in those cases were accompanied by statements by the defendants admitting that the restatements were necessitated by accounting errors. *See Chalverus,* 59 F.Supp.2d at 233; *In re SmarTalk.,* 124 F.Supp.2d at 543; *In re Sunbeam,* 89 F.Supp.2d at 1338. In *Chalverus,* the plaintiffs alleged that the company restated its revenues after its auditors told the company that their earlier advice concerning recognition of revenue on a $5 million transaction "was not correct." 59 F.Supp.2d at 230. Similarly, in *In re SmarTalk,* the plaintiffs alleged that the defendant announced it would have to restate its financial statements because "its accountants had advised the company that there were some potentially significant accounting errors in the treatment of a number of acquisitions SmarTalk made" during the relevant period. 124 F.Supp.2d at 531. In *In re Sunbeam,* the restatement followed an internal audit which concluded that earlier financial statements were incorrect. 89 F.Supp.2d at 1334. Thus, the court construed the restatement as "an admission" that the earlier financial statements were false. *Id.* at 1338.

The fourth case on which Plaintiffs rely, *In re Polaroid,* is more on point. There, the plaintiffs alleged that the defendants made false and misleading statements concerning revenues and pointed to a later restatement of revenues. 134 F.Supp. at 186. Plaintiffs **also** alleged detailed facts concerning a specific transaction in the same period that violated SFAS No. 48. *Id.* Plaintiffs did not allege any facts suggesting that the defendants admitted that the restatement was necessitated by an earlier accounting error. The court held that the allegation that revenues had been

---

4. Ramp's restatements of revenues have no bearing on whether or not its statements relating to 1999 were false when made, as Ramp only restated its revenues for the first two quarters of 2000.

restated was sufficient to show that the earlier statements concerning revenues were false when made where Plaintiffs had also alleged detailed facts concerning a specific transaction that violated SFAS No. 48.

Here, as in *In re Polaroid*, Plaintiffs do not allege any facts indicating that Ramp's restatement of revenues constituted an admission that earlier revenue figures were false. Rather, Ramp explained its restatements for 2000 as being necessitated by "changed circumstances." *See* SAC at 32, ¶ 64. Because the restatements were not explicit admissions of falsity by Defendants, the restatements do not by themselves satisfy the requirement that Plaintiffs plead specific facts showing the statements at issue were false when made. However, the restatements would provide some evidence that statements made about Ramp's revenues and adherence to SFAS No. 48 were false when made if Plaintiffs also alleged specific facts concerning particular transactions during the same time period that violated GAAP, as did the plaintiffs in *In re Polaroid*. Such allegations would raise an inference that Ramp's stated reason for the restatements was false and that in fact, the restatements were necessitated by incorrect accounting. Thus, the Court turns to Plaintiffs' allegations concerning specific transactions.

### b. *Allegations of Specific Improper Transactions and Practices*

Plaintiffs argue that even if Ramp's restatements of its revenues for the first half of 2000 do not establish that the statements about Ramps's revenues were false when made, the facts alleged by Plaintiffs concerning specific improper transactions and practices show that they were. Opposition at 6. In particular, Plaintiffs argue that the detailed allegations in the SAC establish that Ramp in practice did not adhere to SFAS No. 48 in recognizing

revenue, thus rendering its statements about its revenues and its adherence to SFAS No. 48 false at the time those statements were made and contradicting Ramp's assertion that Plaintiffs' claims amount merely to "fraud by hindsight." *Id.* (quoting Motion at 3).

In cases involving § 10(b) claims based on alleged improper revenue recognition, GAAP violations must be pleaded with particularity. *Greebel*, 194 F.3d at 204. In *Greebel*, the court held that the plaintiffs' § 10(b) claim based on alleged improper recognition of revenue for contingent transactions failed for lack of sufficient detail. *Id.* The court explained, "the complaint clearly falls short" because "the allegations in the complaint do not include such basic details as the approximate amount by which revenues and earnings were overstated, the products involved in the contingent transactions; the dates of any of the transactions; or the identities of any of the customers or [employees] involved in the transactions." *Id.*

Here, Plaintiffs have alleged numerous specific facts in their SAC, many of which are related to specific transactions that allegedly violated SFAS No. 48. As currently pleaded, these allegations are insufficient to show that Defendants' allegedly false and misleading statements were false when made. However, with respect to the statements concerning Ramp's revenues and adherence to SFAS No. 48 in the first two quarters of 2000, Plaintiffs' SAC suggests that they may be able to amend their complaint to sufficiently allege that these statements were false when made, as discussed below.

### (1) *Allegations Regarding 1999 GAAP Violations*

■ Plaintiffs' allegations for 1999 are set forth in paragraphs 50 and 51 of the SAC. Almost all of these allegations are too vague and general to establish a GAAP

violation in 1999 with respect to recognition of revenues. The most serious allegation regarding 1999 is contained in paragraph 50(a) of the SAC. In this paragraph, Plaintiffs allege that an "operations specialist" ("Confidential Witness No. 2") who worked in Ramp's Fremont warehouse said that his supervisor told him that revenue could only be booked if products were shipped by the end of the quarter. The SAC goes on to allege (without specifically attributing the information to Confidential Witness No. 2) that "[a]t each quarter's end, so-called sweeper trucks would come to temporarily take the product away from the docks, for about a week, so that Ramp could book the shipment as revenue. After their temporary removal by the 'sweepers,' the products were returned to Ramp within a week."

The Court finds that Plaintiffs' "sweeper truck" allegations fall short in several respects. First, the last two sentences are not explicitly attributed to a source and are not supported by specific facts showing how that source knew that the products were merely taken away for a week (rather than delivered to a customer) and further, that the products that came back were the same ones. Even more troublesome is Plaintiffs' failure to allege any specific dates or particular products that were taken by the sweeper trucks. Nor have Plaintiffs alleged any specific facts about the recognition of revenue associated with this practice, either as to amount or how Plaintiffs know these amounts were recognized. As a result, this allegation is insufficiently specific to establish that Defendants' statements concerning revenue and adherence to SFAS No. 48 in 1999 (or, as discussed below, in 2000) were false when made.

### (2) *Allegations Regarding 2000 GAAP Violations*

Plaintiffs' SAC includes allegations concerning a transaction in the first quarter of 2000 with Telsource. It also alleges specific facts concerning three transaction in the second quarter of 2000, with Multiple Zones, Inc., myCIO.com and Xiao Tong. The sufficiency of Plaintiffs' allegations as to each transaction is addressed below.

### (a) *Telsource*

█ Plaintiffs make the following allegation regarding Ramp's deal with Telsource:

A large sale to Telsource, valued at between $900,000 and $1,000,000 constituted 14% of Ramp's sales for the first quarter of fiscal 2000. According to Confidential Witness No. 1, Gary Metalonis negotiated the deal. The terms of the deal required Ramp to assist in the resale of the merchandise by Telsource. When Ramp was unable to locate buyers for Telsource, $900,000 worth of product was returned and Gary Metalonis was demoted.

SAC at 23–24, ¶ 56(g). Confidential Witness No. 1 has now been identified as Walter Allen, a former Ramp regional sales director. Opposition at 1. Defendants assert that this allegation fails to establish a GAAP violation because Plaintiffs provide no details concerning whether Telsource paid Ramp for the product at issue and whether payment was somehow contingent on resale of the product. Motion at 19. Defendants also argue that this transaction did not violate SFAS No. 48 because Ramp reserved for "a substantial portion of the Telsource transaction during the second quarter." Motion at 20. The Court finds that the amount of reserves set by Defendants has little bearing on whether or not a GAAP violation occurred. However, the Court agrees with Defendants that Plaintiffs have failed to allege sufficient specific facts to establish that the Telsource deal represents a GAAP violation.

**1068**

As an initial matter, the SAC does not explicitly allege that revenue was recognized for the Telsource transaction. If it was not, there was no violation of SFAS No. 48. However, Plaintiffs come close to alleging that revenue was recognized when they point to Ramp's 10–Q for the first quarter of 2000, which stated that sales to Telsource accounted for 14% of Ramp's first quarter revenues. *See* Opposition at 7; Exh. D to Request For Judicial Notice at 10. When Plaintiffs amend their complaint, they should (if they can in good faith) make it clear that the revenues listed in the 10–Q arose from the Telsource transaction alleged in the complaint.

A more serious problem with Plaintiffs' allegations regarding the Telsource deal is Plaintiffs' failure to allege sufficient specific facts to show that a GAAP violation occurred, even assuming revenue was recognized on the Telsource deal. Under SFAS No. 48, where a buyer has the right to return a product, revenue may be recognized only where the following six requirements have been met:

a. The seller's price to the buyer is substantially fixed or determinable at the date of sale;

b. The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product;

c. The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product;

d. The buyer acquiring the product for resale has economic substance apart from that provided by the seller;

e. The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer;

f. The amount of future returns can be reasonably estimated.

SFAS No. 48. Because Plaintiffs do not allege that Telsource did not pay, or was not obligated to pay Ramp for the sale, the part of the allegation that comes closest to stating a violation of SFAS No. 48 is the allegation that Ramp was required to assist in resale of the product. However, SFAS No. 48(e) does not say that *any* efforts to assist in resale make revenue recognition improper. Rather, this section prohibits recognition of revenue where the seller has a "significant" obligation to "directly bring about resale." Thus, in order to adequately allege a violation of SFAS No. 48 based on Ramps' obligation to assist Telsource in resale of Ramp's products, Plaintiffs need to allege specific facts concerning the type of assistance Ramp was required to offer Telsource. Plaintiffs must allege sufficient specific facts to establish that Ramp had a "significant" obligation to "directly" bring about resale, in violation of SFAS No. 48. *See In re Secure Computing Corp. Securities Litigation,* 120 F.Supp.2d 810, 820 (N.D.Cal. 2000) (holding that § 10(b) claim based on premature recognition of contingent revenue was not adequately alleged, even though plaintiffs alleged the identity of the parties to the transaction, the date, the value of the contract, the amount by which revenues were overstated and the accounting violation at issue because plaintiffs did not adequately explain why it was improper to recognize revenues when they did). Alternatively, Plaintiffs may be able to allege a violation SFAS No. 48 if they allege specific facts showing that Telsource had no obligation to pay Ramp for the products it received or that the obligation was contingent on resale.

The Court rejects Plaintiffs assertion that they have alleged an independent violation of SFAS No. 48 by alleging that Ramp could not have reasonably estimated reserves with respect to the Telsource transaction because Ramp had no payment

history with Telsource. *See* Opposition at 7. First, the Court does not find a specific allegation in the SAC concerning the absence of a payment history with Telsource. Assuming such an allegation were included, however, it would be insufficient to show a violation of SFAS No. 48 without more specific facts. SFAS No. 48 does not set out bright line rules concerning when the amount of reserves can be reasonably estimated. Rather, it sets out four factors that should be considered in making this determination. One of these factors is "absence of historical experience with similar types of sales of similar products, or inability to apply such experience because of changing circumstances, for example, changes in the selling enterprises' marketing policies or relationships with its customers." SFAS No. 48 at ¶ 8(c). However, even where one of these factors exists, this "may not be sufficient to prevent making a reasonable estimate." *Id.* There is no per se rule that a reasonable estimate of reserves cannot be made for a new customer. Thus, Plaintiffs have not adequately alleged a violation of on this basis.

On the other hand, Defendants' argument that the transaction was proper because Ramp set large reserves for possible returns has little or no bearing on whether or not there was a violation of SFAS No. 48. Although failure to set adequate reserves *may* show a violation of SFAS No. 48, *see, e.g., In re Telxon,* 2000 WL 33140513 (N.D.Ohio), Plaintiffs do not allege that Defendants violated SFAS No. 48 by setting inadequate reserves. Rather, Plaintiffs allege violations of SFAS No. 48 based on other requirements of that standard. Therefore, the adequacy of Ramp's reserves is not relevant to Plaintiffs' allegations that Ramp violated SFAS No. 48. Nor does the Court accept Defendants' argument to the extent Defendants imply that revenue may be recognized under SFAS No. 48 on *any* transaction so long as adequate reserves are set. The Court finds no authority to support this proposition. To the contrary, it is clear from the case law that a securities fraud claim may be based on improper recognition of revenues under SFAS No. 48, regardless of the amount of reserves set.

### (b) *Multiple Zones, Inc.*

■ Plaintiffs' allegations concerning Ramp's deal with Multiple Zones, Inc. ("MZI") are contained in paragraph 74(g) of the SAC. According to Plaintiffs, in the second quarter of 2000, Ramp shipped between $1.5 and $2 million worth of product to MZI, "for eventual sale to Microsoft employees." SAC at ¶ 74(g). For their part, Microsoft was to offer subsidies for their employees to purchase the products, but Microsoft "would not agree to the deal until after it had the opportunity to test the product itself." *Id.* According to Walter Allen, he was instructed to "close the deal so that it could be booked as revenue for the second quarter of 2000," but Microsoft had not completed testing in early June 2000. *Id.* According to another witness, sales were disappointing and 80 to 90 percent of the order was returned in the fourth quarter of 2000. *Id.* Allegedly, Ramp paid MZI "1.5% interest per month to hold the product during the third quarter while Microsoft set the pricing on the deal." *Id.*

As is true of the Telsource transaction, Plaintiffs fail to explicitly allege that revenue was recognized on the MZI deal. However, they come close to doing so when they allege in a separate section of the SAC that Ramp recognized revenue on a deal with MZI in the second quarter of 2000. *See* SAC at ¶ 74(d). When Plaintiffs amend their complaint, they should make clear that revenue was recognized on this particular transaction.

A more serious shortcoming of the SAC is its failure to allege specific facts showing exactly how the MZI deal violated SFAS

No. 48. Although Plaintiffs allege that revenue was booked before Microsoft had finished testing the product, Plaintiffs do not allege in their SAC that MZI's obligation to pay for the product was contingent on Microsoft's approval. Similarly, although Plaintiffs' SAC suggests that the price was not set at the time revenue was booked on the deal, *see* SAC at ¶ 74(g) (alleging that Ramp paid MZI to hold the product "while Microsoft set the pricing on the deal")— which would violate SFAS No. 48—the only specific facts alleged regarding Microsoft's role in the "deal" indicate that Microsoft was considering whether or not to offer subsidies to employees who purchased the product. There is no specific allegation showing that Microsoft had any role in setting the price as *between Ramp and MZI*. In the absence of these allegations, the facts plead in the SAC do not show that Ramp violated SFAS No. 48 by booking revenue on the transaction before Microsoft finished testing the product.

While Plaintiffs have not adequately alleged a violation of SFAS No. 48, they presented evidence in opposition to this Motion suggesting they may be able to do so. In particular, Plaintiffs have provided copies of internal e-mails which suggest that the sale to MZI was, in fact, contingent on Microsoft's approval. *See* Exh. K to Declaration of Lionel Z. Glancy in Support of Opposition To Motion To Dismiss Second Amended Complaint ("Glancy Decl."). Plaintiffs also point to allegations in a complaint filed in a separate action against Ramp, brought by Walter Allen, stating that the MZI deal was contingent on Microsoft's agreeing to the deal. *See* Allen Complaint at ¶¶ 6–7, Exh. A to Glancy Decl. If Plaintiffs can amend their complaint in this action to show that the MZI deal was contingent on Microsoft—either because the price that MZI was to pay Ramp was tentative pending Microsoft approval or because MZI did not have an obligation to pay for the product until Mi-

crosoft approved the deal—Plaintiffs will have adequately alleged a violation of SFAS No. 48 based on the MZI deal. *See In re Nuko*, 199 F.R.D. 338, 343 (N.D.Cal. 2000) (holding that § 10(b) claim was stated where deal was contingent on results of further testing).

### (c) *myCIO.com*

■ Plaintiffs allege that Ramp announced a deal with myCIO.com on May, 2000 and that the deal represented 29% of Ramp's revenues for the quarter. SAC at 34, ¶ 69. Plaintiffs further allege that according to Walter Allen, "this was another instance where the purchaser warehoused Ramp merchandise so that Ramp could accrue the transaction as revenue." SAC at 38, ¶ 74(f).

Although Plaintiffs have adequately alleged that revenue was recognized on this transaction, Plaintiffs' allegation that Defendants "warehoused" product is too vague an allegation from which to conclude that a GAAP violation has occurred. If Plaintiffs' allegation of "warehousing" amounts to an allegation that Ramp paid buyers to store its products pending sale to end-users, such an allegation does not establish a violation of SFAS No. 48. If, on the other hand, Plaintiffs intend by using the term "warehoused" to allege that the buyer had no obligation to purchase the product, or that the obligation was contingent on resale, the Plaintiffs may be able to show that recognition of revenue on this transaction violated GAAP. When Plaintiffs amend their complaint, they may clarify the meaning of "warehoused."

### (d) *Xiao Tong*

■ Plaintiffs allege that Ramp violated SFAS No. 48 by improperly booking revenue for a deal with Xiao Tong Electronics that represented 35% of its second quarter 2000 revenues. SAC at 34, ¶ 74(e). In particular, Plaintiffs allege that revenue should not have been recognized in the

second quarter because the deal was not signed until July 2000 (in the third quarter). *Id.* In addition, Plaintiffs allege that revenue should not have been recognized on this transaction at all because, according to Walter Allen, this was "one of those deals where a friend of Veerina's agreed to hold merchandise for Ramp so that Ramp could book revenue." *Id.*

With respect to the allegation that the revenue was recognized before the contract was signed, the Court does not find that this amounts to a violation of SFAS No. 48 so long as there is an obligation to pay for the product purchased and the price is established. *See* SFAS No. 48. However, the Allen allegation is more problematic. As noted with respect to the myCIO.com transaction, Allen's assertion that the products were held so that revenue could be booked could be construed as an allegation that the buyer did not, in fact, have an obligation to pay for the product, which would violate SFAS No. 48. However, Plaintiffs have not explicitly alleged that there was no obligation to pay under the Xiao Tong deal. If they can, Plaintiffs may amend their complaint to add this allegation.

### (3) *Demand Statement*

■ Plaintiffs allege that Defendants made a false and misleading statement in Ramp's April 25, 2000 press release, which said that "[o]rders for our broadband solutions exceeded our expectations and we are increasing production to meet the demand." SAC at 20, ¶ 53. According to Plaintiffs, this statement was false because demand for Ramp's products by *end-users* was extremely low during the first and second quarters of 2000 and Ramp's officers were well aware of this fact. *Id.* In fact, the SAC contains numerous specific allegations establishing that Ramp's products were not selling through to end-users. *See, e.g.,* SAC at 20–21, ¶ 55 (listing sales of Ramp's DSL equipment to end users by distributors in second quarter of 2000 based on point of sale charts); SAC at ¶ 56(h) (concerning large amount of inventory some distributors of Ramp products had on hand in first quarter of 2000); *see also* Point of Sale Charts received by Veerina in first two quarters of 2000, Exh. G to Glancy Decl. Thus, to the extent that the demand statement can be read as a statement about demand for Ramp's products by end-users, Plaintiffs have sufficiently alleged that it was false at the time it was made.

### c. *Conclusion with Respect to Falsity*

As described above, Plaintiffs have adequately alleged the falsity of the demand statement. They have not adequately alleged falsity with respect to the statements regarding 1999 revenue and adherence to SFAS 48 in that year, and to that extent the SAC is dismissed with prejudice. They may amend with respect to the specific transactions in the first and second quarters of 2000 described above in section III.B.2.b.(2). In so doing, Plaintiffs may amend only to cure the specific defects identified by the Court with respect to the specific transactions. No other amendments with respect to falsity will be permitted.

### 3. *Scienter*

Plaintiffs must allege specific facts supporting a strong inference that Defendants made false and misleading statements or omissions with "deliberate recklessness." *Silicon Graphics,* 183 F.3d at 975. Plaintiffs rely heavily on their allegations of GAAP violations to show scienter by Defendants. *See* Opposition at 22–23. They also point to a number of other "indicia" of scienter, including: 1) the magnitude of the accounting error; 2) knowledge by Ramp officers that customers were overstocked with inventory; 3) the widespread practice of granting of broad rights of

return; 4) the practice of delaying the return of unsold product; 5) the "simplicity" of the accounting principle at issue; 6) the fact that the alleged overstatement of revenues converted a loss into a profit; and 7) allegations showing that the GAAP violation were intentional.

Defendants assert that Plaintiffs' allegations of a GAAP violation and the other "indicia" of scienter on which Plaintiffs rely are not sufficient to establish scienter. In addition, Defendants assert that there can be no scienter as to Defendant McElwee because none of the statements at issue can be attributed to him. Finally, Defendants assert that because Plaintiffs have failed to establish scienter as to either of the individual defendants, they also fail to establish scienter as to the corporation.

The Court finds that Plaintiffs have failed in their SAC to establish scienter as to any Defendant because Plaintiffs have not alleged sufficient facts to establish that any of the specific transactions addressed in the SAC violated SFAS No. 48, as discussed above. *See Greebel*, 194 F.3d at 203 (holding that "to support even a reasonable inference of scienter ... the complaint must describe the violations with sufficient particularity").

With respect to 1999, Plaintiffs' SAC does not allege *any* specific transactions. Nor did Plaintiffs present evidence or arguments in response to the Motion suggesting Plaintiffs would be able to amend their complaint to meet the pleading requirements of Rule 9(b) and the PSLRA with respect to the statements concerning revenues and adherence to SFAS No. 48 in 1999. Therefore, Plaintiffs' claims are dismissed *without* leave to amend to the extent that they are based on these statements. *See Desaigoudar v. Meyercord*, 223 F.3d 1020, 1026 (9th Cir.2000) (affirming district court's dismissal of securities claim for failure to meet requirements of Fed.R.Civ.P. 9(b) and PSLRA where it was "clear ... that the complaint could not be saved by any amendment" and noting that district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended complaint).

The Court also dismisses Plaintiffs' claims *without* leave to amend to the extent that they are based on the demand statement in the April 25, 2000 press release. In that press release, Ramp announced that "[o]rders for our broadband solutions exceeded our expectations and we are increasing production to meet the demand." SAC at 20, ¶ 53. Plaintiffs assert that this statement was an intentional misrepresentation of demand for Ramp's product, pointing to specific allegations showing that Ramp's top officers knew that products were not selling through to end-users.

The problem with Plaintiffs' position is that the statement does not explicitly refer to demand by end-users but rather, refers generally to demand. Only if the allegations give rise to a strong inference that the statement refers to end-users would Plaintiffs have satisfied the scienter requirement—for there are allegations that that demand by end-users was not increasing. While such a statement could reasonably be construed as a statement about demand by end-users, it could also be read as a statement about demand by Ramp's customers. Ramp made it clear in its public filings that its customers were distributors and value-added resellers rather than end-users. *See, e.g.*, Ramp's First Quarter 2000 10–Q Report at 5, Exh. D to Defendant's Request For Judicial Notice. Indeed, it is these customers who would have placed the "orders" referred to at the beginning of the statement, suggesting that the latter reading of the demand statement is at least as plausible, if not more plausible than the reading advanced

by Plaintiffs. These allegations, therefore, are insufficient to give rise to a *strong* inference that the statement referred to end-users—or that Defendants acted with the required scienter. Plaintiffs have not indicated that they can allege any further facts that would show that the demand statement referred to demand by end-users. Therefore, Plaintiffs will not be permitted to amend their complaint with respect to this statement.

On the other hand, Plaintiffs' allegations concerning specific transactions in 2000, along with evidence and arguments raised in response to Defendants' Motion, suggest to the Court that Plaintiffs may be able to amend their complaint to meet the scienter requirement of the PSLRA with respect to the statements concerning revenues and adherence to SFAS No. 48 in 2000, at least as to Defendants Veerina and Ramp. Below, the Court addresses Plaintiffs' allegations as they relate to scienter for each of the three Defendants in this action with respect to the statements concerning Ramp's revenues and adherence to SFAS No. 48 in 2000.

**a. *Veerina***

Plaintiffs allege that Veerina acted with deliberate recklessness when he made the statements contained in Ramp's SEC filings and press releases concerning Ramp's 2000 revenues and adherence to SFAS No. 48 because: 1) Veerina personally engaged in deliberately illegal conduct when he negotiated deals that violated GAAP, namely, the myCio.com and the Xiao Tong transactions; and 2) Veerina had access to information that revenue was being improperly booked on major transactions, including the Telsource and MZI transactions.

**(1) *The myCIO.com and Xiao Tong Transactions***

■ Plaintiffs allege that Veerina's statements [5] concerning Ramp's revenues and adherence to SFAS No. 48 in 2000 were made with deliberate recklessness because Veerina personally negotiated deals with myCIO.com and Xiao Tong that were, in essence "phony" sales negotiated for the sole purpose of recognizing revenue. As discussed above, Plaintiffs' allegations concerning these transactions do not, as currently pleaded, contain sufficient detail to establish that these deals truly were "phony" sales, or even, that they violated SFAS No. 48. As such, they are not sufficient to support a finding of scienter as to Veerina (or any other defendant). However, if Plaintiffs are able to amend their complaint in a manner consistent with the previous section of this opinion, these transactions—along with the large restatements of revenues for the first two quarters of 2000—would be sufficient to meet the scienter requirement under the PSLRA as to Veerina.

Allegations of GAAP violations do not, standing alone, create a strong inference of scienter. *Hockey v. Medhekar*, 30 F.Supp.2d 1209, 1224 (N.D.Cal.1998); *In re McKesson HBOC Inc. Securities Litigation*, 126 F.Supp.2d 1248, 1272–1273 (N.D.Cal.2000). "However, when significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter." *In re McKesson HBOC Inc.*

---

5. To the extent these statements were made in an press release (the April 25, 2000 press release) and in reports filed with the SEC, they can be attributed to Veerina under the "group pleading doctrine" on the basis that Veerina was the president and CEO of Ramp at the time these statements were made. *See In re Secure Computing Corp.*, 120 F.Supp.2d 810, 821 (N.D.Cal.2000) (noting that the majority of courts in the Ninth Circuit that have addressed the issue have concluded that the group pleading doctrine survived the enactment of the PSLRA). Under the group pleading doctrine, it is presumed that registration statements, reports and press releases are collective action by the officers and directors of the company. *Id.*

*Securities Litigation,* 126 F.Supp.2d at 1272–1273; *Greebel,* 194 F.3d at 203 (noting that "violations of GAAP standards such as FAS 48 could provide evidence of scienter"). Further, allegations of GAAP violations in conjunction with other details establishing that a defendant acted with deliberate recklessness may be sufficient to establish scienter. *In re Nuko,* 199 F.R.D. 338, 344 (N.D.Cal.2000); *see also In re SmarTalk Teleservices Inc. Securities Litigation,* 124 F.Supp.2d 527, 539 (S.D.Oh.2000) ("Although allegations of accounting errors in violation of GAAP are, by themselves, insufficient to establish scienter for a securities fraud claim ... such violations are relevant when combined with allegations to show that Defendants knew or could have known of the errors.").

The particular amendments necessary to survive a motion to dismiss are described in section III.B.2.b.(2) above. With such amended allegations, Plaintiffs will have alleged more than general GAAP violations. *See Greebel,* 194 F.3d at 202 (stating that the intentional warehousing of products where there is no obligation or expectation that the products will be purchased is considered "very serious"). Rather, they will have alleged "very serious" conduct by Veerina that he would have had good reason to know was improper, especially as Ramp repeatedly stated in its public filings that it had reviewed the requirements of SFAS No. 48. *See Id.; In re MicroStrategy Inc. Securities Litigation,* 115 F.Supp.2d 620, 637 (E.D.Va. 2000) (holding that there was strong inference of scienter and citing as one reason for this conclusion fact that the accounting principle at issue, that revenue cannot be recognized on unexecuted or contingent contracts, is simple and obvious). If Plaintiffs can amend the allegations regarding these two transactions as described, the magnitude of the myCIO.com and Xiao Tong transactions will also provide "powerful circumstantial evidence" of scienter. *See In re McKesson,* 126 F.Supp.2d at 1273 (holding that where revenue inflation is "widespread and significant" a strong inference arises that "senior management intentionally misstated earnings"); *see also* SAC at 34, ¶ 69 (alleging that myCIO.com deal accounted for 29% of Ramp's second quarter revenues); SAC at 36, ¶ 72 (alleging that Ramp's deal with Xiao Tong accounted for 35% of its second quarter revenue). Finally, these two large sales would, if amended as discussed above, support a strong inference that Ramp's large restatement of revenues for the first two quarters of 2000 was necessitated not by changed circumstances but rather, by intentional misstatement of revenues in those periods, further supporting a strong inference of scienter. *See McKesson,* 126 F.Supp.2d at 1273; *see also In re MicroStrategy, Inc. Securities Litigation,* 115 F.Supp.2d 620, 636 (E.D.Va. 2000) (holding that significant overstatement of revenues tends to support finding of scienter).[6]

---

6. The Court rejects Defendants' assertion that Plaintiffs have failed to plead facts that would support a strong inference of scienter because, having failed to allege any insider trading, the allegations in the complaint "make[ ] no sense." Motion at 2. A court may decline to draw an inference of scienter where such an inference would be irrational. *In re McKesson HBOC Securities Litigation,* 126 F.Supp.2d 1248, 1269 (N.D.Cal.2000) (citing *Melder v. Morris,* 27 F.3d 1097, 1102–03 (5th Cir.1994) for proposition that courts refuse to indulge irrational inferences of fraudulent intent"). However, "[a] motive for fraud, such as personal gain, is not a required element of scienter or of fraud in general." *Id.* Nor is insider trading required to show scienter. *Greebel,* 194 F.3d at 197 (stating that "the PSLRA neither prohibits nor endorses the pleading of insider trading as evidence of scienter, but requires that the evidence meet the 'strong inference' standard."). Here, Plaintiffs have alleged that Ramp "was depen-

## (2) *The Telsource and MZI Transactions*

Plaintiffs also assert that Veerina's Q1 and Q2 2000 statements concerning revenues and adherence to SFAS No. 48 were deliberately reckless because Veerina knew about the Telsource and MZI transactions, even if he was not involved in negotiating them. Plaintiffs point to e-mail messages on which Veerina was copied discussing the MZI deal. *See* Opposition at 28 and Exh. K to Glancy Declaration. Plaintiffs argue further that these transactions were so large that Veerina should be presumed to have known about them, supporting a strong inference of scienter. *Id.*

As currently pleaded, Plaintiffs' SAC is insufficient to show scienter on the part of Veerina based on the MZI and Telsource transactions. Plaintiffs have failed to allege sufficient facts to establish that these transactions violated GAAP. However, if Plaintiffs can amend their complaint in the manner discussed above, the allegations will be sufficient to meet the PSLRA's scienter requirement for Veerina. In particular, the magnitude of the Telsource and MZI transactions creates a strong infer-

ence that Veerina must have been aware of these transactions, including their basic terms. When considered in conjunction with the large restatement for the first and second quarters of 2000, these transactions (if adequately pleaded) would support a strong inference of scienter.

In *Epstein v. Itron, Inc.,* 993 F.Supp. 1314, 1326 (E.D.Wash.1998), the court held in a case involving allegations of securities fraud under § 10(b) that "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers." Based on this presumption, the court found scienter on the part of top officers in the company. *Id.* The court explained: "if it is true, as Plaintiff alleges, that Itron's core product is technologically incapable of meeting requirements that are central to Itron's continued survival as a business entity, it can be strongly inferred that key officers ... had knowledge of this fact." *Id.* Similar reasoning has been adopted by numerous courts in applying the pleading requirements of the PSLRA for scienter. *See, e.g., In re Peoplesoft, Inc.,* 2000 WL 1737936 (N.D.Cal.2000) (holding that offi-

dent on raising funds through the sale of equity to fund its operations" because "[a]s of December 31, 1999, the Company had an accumulated deficit of $47.1 million." SAC at 13, ¶ 43. Thus, to attract potential investors, it was "essential that the Company continue to provide the appearance of a company with increasing sales and revenues, particularly with regard to new products." *Id.* Further, Plaintiffs have alleged that Ramp's president, Veerina, "kept a high level of intensity and 'pumped things up' at the Company by telling people that Ramp would eventually be purchased by another company." SAC at 51, ¶ 105. While these allegations concerning Defendants' motives are too generic by themselves to give rise to an inference of scienter, they are not so irrational as to negate a finding of scienter based on other allegations in the SAC. *See In re Nuko,* 199 F.R.D. 338, 343–344 (N.D.Cal.2000) (holding that the defen-

dants' need to increase revenue and desire to consummate takeover deal, coupled with other factors, was sufficient to give rise to a strong inference of scienter and noting that the absence of any allegations concerning insider trading had "little bearing in determining whether plaintiffs [had] adequately pleaded scienter").

The Court also rejects Defendants' assertion that scienter "cannot be shown" in the face of the clean audit opinion it received from Arthur Andersen. Motion at 15. Although the cases cited by Defendants support the conclusion that a clean audit may be considered in determining whether there is scienter, there is no hard and fast rule that there can be no scienter where there has been a clean audit. Moreover, the audit is of little or no probative value with respect to the statements concerning 2000 revenues and adherence to SFAS No. 48 because it covered only 1999.

cers must have been aware of loss of major customers and of "massive defects in their flagship products" and agreeing with analysis of *Epstein v. Itron*, with the "proviso" that "[l]ike all other circumstantial inferences, the persuasive force of each situation must be evaluated individually"); *In re Turbodyne Technologies, Inc.*, CV–99–697 (C.D.Cal. March 15, 2000) slip op. at 41 (relying on *Epstein v. Itron*, among other cases, in holding that top officers must have known true facts about company's manufacturing capacity for their core technology); *Danis v. USN Communications*, 73 F.Supp.2d 923, 938 (N.D.Ill.1999) (holding that it was proper to "attribute knowledge, or at least reckless disregard" of "pervasive problems," including "severe improprieties" regarding recognition of revenue, to top officers and citing to *Epstein v. Itron); Chalverus*, 59 F.Supp.2d at 235 (noting that "courts have held that certain information, particularly 'facts critical to ... an important transaction[,] generally are so apparent that their knowledge may be attributed to the company and its key officers.' ") (quoting *Epstein v. Itron*, 993 F.Supp. at 1326).

One court in this district has suggested, without reaching the issue, that the presumption created in *Epstein v. Itron* may not have survived the Ninth Circuit's decision in *Silicon Graphics. See In re Read–Rite Corp. Securities Litig.*, 2000 WL 1641275 at *6 (N.D.Cal.). In *Silicon Graphics*, the Ninth Circuit rejected the position taken by the Second Circuit that the pleading requirements of the PSLRA could be satisfied by pleading "mere motive and opportunity or an inference of recklessness" in favor of a standard requiring "a strong inference of deliberate recklessness." 183 F.3d at 974–975. The court cited to *Epstein v. Itron* as an example of a case in which the Second Circuit approach had been followed. The *Silicon Graphics* court did not, however, discuss *Epstein v. Itron* or explicitly address the

question of whether knowledge of key transactions can be imputed to top officers in a company.

This Court agrees with the reasoning in *In re Peoplesoft, Inc.*, 2000 WL 1737936 (N.D.Cal.2000), that generally, where major transactions or core information is at issue, an inference arises that top officers of a company were aware of the transaction or information. Nor does this Court find that such a presumption is inconsistent with the holding of *Silicon Graphics*, so long as the court examines the specific facts of the case to determine the strength of the inference that the defendant acted with scienter under the particular circumstances of the case.

Here, the magnitude of the Telsource and the MZI transactions give rise to a strong inference that Veerina knew about them. Both transactions represented a very substantial portion of Ramp's revenues: the Telsource deal was valued at $900,000 to $1,000,000 and represented 14% of Ramp's first quarter 2000 revenues, SAC at 23, ¶ 56(g), while the MZI deal was valued at between $1.5 million and $2 million. Further, if Plaintiffs were to amend their complaint to show that these transactions violated GAAP, these transactions would support a strong inference of deliberate recklessness when considered in light of other facts Plaintiffs assert they will be able to allege or have already alleged in their complaint. First, Plaintiffs have presented evidence which, if incorporated into their amended complaint, would further support the inference that Veerina was aware of these transactions. In particular, Plaintiffs present a press release announcing the deal with Telsource, *see* Exh. H to Glancy Decl., and an e-mail that was copied to Veerina regarding the MZI deal, *see* Exh. K to Glancy Decl. Second, Plaintiffs have alleged that there was a large restatement of revenues

for the first and second quarters of 2000. As discussed above with reference to the myCIO.com and the Xiao Tong deals, the Telsource and MZI transactions, if amended to sufficiently allege GAAP violations, would support a strong the inference that the restatement of revenues was a result of deliberate overstatement of revenues in the first and second quarters of 2000 rather than "changed circumstances," as stated by Ramp.

### (3) *Channel Stuffing Allegations*

■ Plaintiffs also assert that they have sufficiently alleged scienter on the basis of specific allegations concerning information that was available to Veerina and others at Ramp that their distributors were massively overstocked with Ramp products. Opposition at 25. To the extent these allegations amount to allegations of "dumping" or "channel stuffing," Plaintiffs' allegations do not support a finding of scienter as to Veerina or any other Defendant. Channel stuffing is defined as "the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as distributors no longer make orders while depleting their excess supply." *Steckman v. Hart Brewing Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998). A number of courts have held that "channel stuffing" gives rise to a "very weak" inference of scienter—if any at all—in § 10(b) actions because there are "a number of legitimate reasons for attempting to achieve sales earlier." *In re Ashworth Inc. Securities Litigation*, 2000 WL 33176041 at *8; *see also Greebel*, 194 F.3d at 204. Therefore, the Court does not find that Plaintiffs' channel stuffing allegations support an inference of scienter, as to Veerina or any other Defendant, with respect to the statements concerning 2000 revenues and adherence to SFAS No. 48.

### (4) *Granting of Broad Rights of Return*

Plaintiffs assert that their allegations that Defendants granted broad rights of return support a finding of scienter. They cite to two cases in support of this position, *Chu v. Sabratek Corp.*, 100 F.Supp.2d 815, 821 (N.D.Ill.2000) and *In re Telxon*, 2000 WL 33140513 (N.D.Ohio). Neither case supports the conclusion that broad rights of return, in and of themselves, create an inference of scienter. In *Chu*, the court held that the plaintiffs had established scienter where they alleged facts showing that Defendants booked revenue on "phony" and "consignment sales." 100 F.Supp.2d at 820–821. In other words, the plaintiffs in *Chu* alleged facts showing that defendants not only gave broad rights of return (which appears to be permitted under SFAS No. 48) but also that they registered revenue on these sales without meeting the basic requirement of SFAS No. 48 that where there is a right of return, revenue may only be registered where the buyer has an obligation to pay the seller that is not contingent on resale of the product.

In *Telxon*, the court held that there was a strong inference of scienter where the defendant "increas[ed] sales to Value Added Distributors who could return any item that was not sold, without increasing its reserves for potential sales returns." 2000 WL 33140513 at * 19. *Telxon* is distinguishable from this case because, as discussed above, Plaintiffs have not alleged that Defendants failed to set adequate reserves. Therefore, the fact that Defendants may have afforded broad rights of return does not support a strong inference of scienter on the part of Veerina or any other Defendant.

### (5) *Delaying Return of Unsold Products*

Plaintiffs assert that their allegations that Ramp paid distributors to hold prod-

ucts rather than return them support an inference of scienter. Opposition at 25. They cite to a general allegation that Veerina "dumped" unwanted products on distributors in exchange for payment of a fee to store the product. SAC at 28, ¶ 60(a). They also rely on an allegation that Ramp paid MZI to hold its products pending approval from Microsoft. SAC at 39, ¶ 74(g). As discussed above, dumping does not support a strong inference of scienter. Nor have Plaintiffs presented any authority in support of the proposition that payment of storage fees supports an inference of scienter. Therefore, Plaintiffs' allegations concerning storage payments do not support an inference of scienter.

### (6) *Conclusion Regarding Veerina's Scienter*

If Plaintiffs can amend the four transactions as described in section III.B.2.b.(2) above, the allegations will be sufficient to present a "strong inference" of scienter as to Veerina, and, as a result, as to Ramp.

**b. *McElwee***

▮ Plaintiffs' SAC includes allegations of serious misconduct on the part of Defendant McElwee. Defendants, however, assert that Plaintiffs' claims must fail as to McElwee because none of the allegedly false and misleading statements at issue can be attributed to McElwee. Motion at 7–8. The Court agrees.

In order to state a claim for misrepresentation under § 10(b), plaintiffs must attribute particular fraudulent acts or statements to a particular defendant. Fed. R.Civ.P. 9(b); *Neubronner v. Milken*, 6 F.3d 666, 673 (9th Cir.1993); *In re Oak Technology Securities Litigation*, 1997 WL 448168 at * 10. Courts have found an exception to this rule, however, under the group pleading doctrine. The Ninth Circuit has described this exception as follows:

> In cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, or other "group published information," it is reasonable to presume that these are the collective actions of the officers. Under such circumstances, a plaintiff fulfills the particularity requirements of Rule 9(b) by pleading the misrepresentations with particularity and where possible the roles of the individual defendants in the misrepresentations.

*Oak Technology*, 1997 WL 448168 at * 10 (quoting *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987)); *see also In re Secure Computing Corp. Securities Litigation*, 120 F.Supp.2d 810, 821 (N.D.Cal.2000) (noting that majority of courts in Ninth Circuit have concluded that group published information doctrine survived enactment of PSLRA). The presumption created under the group published information doctrine may be rebutted where a defendant presents evidence that he had no direct involvement in the preparation of the document at issue. *In re Silicon Graphics*, 970 F.Supp. 746, 759 (N.D.Cal.1997).

Here, Plaintiffs allege that McElwee was fired from Ramp on March 31, 2000, well before any of the statements concerning Ramp's revenues and adherence to SFAS No. 48 in 2000 were made.[7] SAC at 53, ¶ 108. Because McElwee was not an officer of Ramp at the time the statements were made, the group published information doctrine cannot apply. Indeed, Plaintiffs essentially concede in their Opposition that the group published information doc-

---

**7.** Ramp's first quarter 2000 Form 10–Q was filed with the SEC on May 11, 2000; Ramp's second quarter 2000 Form 10–Q was filed on August 14, 2000. Ramp's press release referring to revenues in 2000 was made on April 25, 2000.

trine does not apply to McElwee for the statements related to 2000, arguing only that McElwee can be held responsible for the statements relating to Ramp's 1999 performance under that doctrine. *See* Opposition at 31.

Plaintiffs argue, though, that they have sufficiently alleged a § 10(b) claim as to McElwee on the basis of a fraudulent *omission* rather than a fraudulent misrepresentation because McElwee sold 92,000 shares of Ramp stock during the class period without revealing information about "his many sales for which distributors were given broad rights or return," or that distributors were "paid to store product they did not order." Opposition at 31. Because this knowledge rendered Ramp's public statements false and misleading, Plaintiffs argue, McElwee had a duty to reveal that these statements were false and misleading when he sold his Ramp stock.

Plaintiffs are correct that an omission can give rise to a violation of § 10(b). *See Vento & Company v. Metromedia Fiber Network Inc.*, 1999 WL 147732. In *Vento,* the plaintiff was a minority shareholder in a closely held corporation. Defendant was a majority shareholder who purchased plaintiff's shares without disclosing to the plaintiff that the company was about to receive a major infusion of cash and go public. *Id.* at *10. The plaintiff sued the defendant under § 10(b), alleging that he had fraudulently failed to disclose material information about the value of stock shares held by the plaintiff and that as a result, the plaintiff sold his shares to the defendants for less than their true market value. *Id.* The defendant brought a motion to dismiss on the basis that the plaintiff had not met the pleading requirements for a 10(b) claim. *Id.* The Court held that the plaintiff had adequately pleaded his 10(b) claim on the theory that " 'silence in connection with the purchase or sale of securi-

ties may operate as a fraud actionable under § 10(b).' " *Id.* (quoting *Chiarella v. United States,* 445 U.S. 222, 230, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)).

Because McElwee sold Ramp stock during the class period, he had a duty to disclose any known false and material misstatement made by Ramp because, as a corporate insider, McElwee had superior information to the investing public and therefore was in a relationship of "trust and confidence" with respect to the "shareholders of the corporation." *Chiarella,* 445 U.S. at 228, 100 S.Ct. 1108. Nonetheless, Plaintiffs must establish that McElwee's alleged omission was made with scienter. As discussed above, in order to meet this requirement where a claim is based on accounting fraud, Plaintiffs must allege specific facts about particular transactions, including the products involved, the dates of any transactions, the approximate amount by which revenues were overstated and the identities of the customers involved. *See Greebel v. FTP Software, Inc.,* 194 F.3d 185, 204 (1st Cir.1999). Plaintiffs have failed to allege any specific facts involving particular transactions in which McElwee was involved. Therefore, Plaintiffs have failed to show scienter on the part of Defendant McElwee as to any statement relating to Ramp's 2000 performance or adherence to SFAS No. 48. Because Plaintiffs have presented no evidence or arguments to the Court which suggest that they can state a claim as to Defendant McElwee, Plaintiffs' claims against McElwee are dismissed without leave to amend.

#### c. *Ramp*

Plaintiffs assert that they have adequately alleged scienter on the part of the corporation based on the acts of the individual defendants. Opposition at 32. They assert that even if the allegations against Veerina and McElwee do not sup-

port a finding of scienter on the part of the corporation, allegations against other corporate officers, such as Bob Kondamoori, Jerry Jalaba, and Sheila Veerina are sufficient to support a finding of corporate scienter. Opposition at 33. Defendants, on the other hand, assert that there can be no scienter on the part of Ramp because no scienter has been established as to any individual defendant. Reply at 17.

"Corporate scienter relies heavily on the awareness of the directors and officers, who—unlike the public relations or personnel departments—are necessarily aware of the requirements of SEC regulations and state law and of the danger of misleading buyers and sellers." *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir.1995). Here, Plaintiffs have failed to establish scienter as to Veerina and McElwee and therefore, there can be no scienter on the part of the corporation based on the awareness of these individuals. However, to the extent that Plaintiffs may be able to amend their complaint to establish that GAAP violations occurred, they may be able to show scienter on the part of Veerina, as discussed above. If they do, Plaintiffs will also have adequately alleged scienter as to the corporation.

With respect to the other individuals named by Plaintiffs, that is, Kondamoori, Jalaba, and Sheila Veerina, the Court does not find sufficiently specific allegations in the SAC to support a finding of corporate scienter. Kondamoori, whose title was vice president of business development, is alleged to have been involved in both the MZI and the Xiao Tong transactions. *See* SAC at 38, ¶ 74(e) and SAC at 41, ¶ 77(b). However, these allegations fail to establish scienter on the part of the corporation because, as discussed above, Plaintiffs have failed to allege sufficient specific facts to establish that either of these transactions violated SFAS No. 48. The complaint does not include any allegations con-

cerning Jalaba, but Plaintiffs' Opposition to this Motion and the materials that accompanied their Opposition indicate that Jalaba was involved in some way with the MZI deal. Again, though, even if the complaint included allegations about Jalaba, they would not be sufficient to show corporate scienter in the absence of specific allegations showing that the MZI deal violated SFAS No. 48. Finally, the brief and general allegations about Sheila Veerina—that she "played with the records" and kept the failure rate of returned products a secret—are insufficient to show scienter on the part of the corporation. *See* SAC at 19, ¶ 51(c)(3).

## C. *Loss Causation*

██ Defendants assert that Plaintiffs claims must fail because they have failed to allege loss causation. Motion at 22–23. In particular, Defendants assert that the restatements of revenues occurred on November 14, 2000, after the class period ended and therefore, "plaintiffs cannot show the necessary element of loss causation with respect to an alleged readjustment of revenue between the first, second, and third quarters of 2000." Motion at 23 n. 28. Plaintiffs assert that they need not allege that the restatement caused the damage, so long as they allege that the stock price was inflated during the class period and that the damage caused was a foreseeable consequence of the misrepresentation. Plaintiffs are correct.

Plaintiffs allege that investors were fraudulently induced by Defendants' false and misleading statements to buy and hold Ramp stocks at prices that were inflated during the class period, and further, that these investors were hurt when Ramp stock prices fell in response to the announcement on September 29, 2000, that Ramp's third quarter revenues were likely to be much lower than projected. These

 

allegations are sufficient to show loss causation. *See In re Peoplesoft, Inc.*, 2000 WL 1737936 at *4 (holding that loss causation was adequately alleged where complaint "alleged that the stock price was inflated during the class period due to the failure to disclose known bad news and due to forecasts . . . that were unrealistic when made"). A decline in stock prices need not occur within the class period to support a finding that a plaintiff was damaged, so long as the damage was a foreseeable consequence of the misrepresentation. *See AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 216 (2d Cir.2000). Further, the case relied on by Defendants, *Rogal v. Costello*, Fed.Sec.L.Rep. (CCH) ¶ 97,245 at 95,091 (N.D.Cal.1992), is distinguishable in that the alleged misconduct was *never* revealed and thus could not be tied to any loss. That is not the case here, where it is alleged that stock prices plummeted in response to the September 29, 2000 announcement.

### D. *Control Person Liability*

To the extent that Plaintiffs have not adequately alleged scienter for Plaintiffs' § 10(b) claims, Plaintiffs' § 20(a) claims also fail. If Plaintiffs are able to amend their complaint to sufficiently allege a § 10(b) claim for Veerina, they will have also satisfied the requirements for the § 20(a) claim against Veerina.

### IV. *CONCLUSION*

For the reasons stated above, Plaintiffs' Second Amended Complaint is DISMISSED. Plaintiffs' claims are dismissed with prejudice, and without leave to amend, to the extent that they are based on: 1) statements that are not listed in section III(B)(1) of this decision; 2) statements concerning Ramp's revenues and adherence to SFAS No. 48 in 1999; 3) the second sentence of the April 25, 2000 press release, concerning demand for Ramp's products. In addition, all claims against Defendant McElwee are dismissed without leave to amend. Plaintiffs shall be permitted to amend their complaint to allege specific facts showing that the transactions with Telsource, MZI, myCIO.com, and Xiao Tong that are alleged in the SAC violated SFAS 48. No other amendments to the SAC will be permitted. Plaintiffs shall file a Third Amended Complaint within thirty (30) days of this Order. Within thirty (30) days of the filing of the Third Amended Complaint, Defendants may file a further motion to dismiss if they conclude, in good faith, that Plaintiffs have failed to add the allegations described in this Order. If they do so, no opposition or hearing will be required unless ordered by the Court.

IT IS SO ORDERED.